NATURAL RESOURCES DEFENSE COUNCIL, INC., PROJECT ON CLEAN AIR, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

NATURAL RESOURCES DEFENSE COUNCIL, INC., PROJECT ON CLEAN AIR, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 72–1219, 72–1224.

United States Court of Appeals, First Circuit.

Argued Jan. 2, 1973.

Decided May 2, 1973.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

Petitioners seek review [1] of decisions by the Administrator of the Environmental Protection Agency (E.P.A.) approving portions of the Rhode Island and Massachusetts air pollution implementation plans.[2]

The Clean Air Amendments of 1970 [to the Air Quality Act of 1967], 42 U.S.C. § 1857c–3 et seq., require the Administrator—as he has already done—to establish national primary and secondary ambient air quality standards stating how much of each pollutant shall be allowed in the ambient air. Primary standards are maximums allowable to protect the public health; secondary standards are maximums to protect the public welfare from any known or anticipated adverse effects. Each state must then submit to the Administrator a plan for implementation, maintenance and enforcement of the standards. § 1857c–5(a)(1). The plan must be such as to achieve primary standards within three years (subject to a possible two-year extension), and secondary standards within a reasonable time. § 1857c–5(a)(2); see § 1857c–5(e) and (f). The Administrator is to approve or disapprove a plan, or any portion, in light of its ability to meet those timetables and its fulfilling of the other requirements of § 1857c–5(a)(2)(B) through (H). If a state plan or any portion does not meet the statutory requirements, the Administrator is directed to publish his own regulations setting forth an implementation plan, or portion thereof for the state. § 1857c–5(c).

Petitioners raise eight objections to the Administrator's approval of the

Richard E. Ayres and Thomas B. Arnold, Boston, Mass., for petitioners.

Thomas C. Lee, Washington, D. C., Atty., Department of Justice, with whom Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark, and Martin Green, Attys., Department of Justice, were on brief, for respondent in case 72–1219.

John P. Hills, Atty., Department of Justice, with whom Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark, and Martin Green, Attys., Department of Justice, were on brief, for respondent in case 72–1224.

1. "A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 1857–5(b)(1).

2. The Administrator's approval of the Rhode Island and Massachusetts plans, at 37 Fed.Reg. 10891 and 10872–73 (May 31, 1972), consists of a brief statement that the plans are satisfactory, unaccompanied by any findings, conclusions or supporting rationale.

Rhode Island plan, and four to the Massachusetts plan.[3]

## THE RHODE ISLAND PLAN

### I

Petitioners argue that the Administrator erred in approving the classification of the Metropolitan Providence Interstate Air Quality Control Region (MPIAQCR) as Priority III for photochemical oxidants and carbon monoxide.[4] The classification was made pursuant to 40 C.F.R. § 51.3(b)(2):

> In the absence of measured data to the contrary, classification with respect to carbon monoxide, photochemical oxidants and nitrogen dioxide will be based on the following estimate of the relationship between these pollutants and population: Any region containing an area whose 1970 "urban place" population, as defined in the U.S. Bureau of Census, exceeds 200,000 will be classified Priority I. All other regions will be classified Priority III.

■ Both parties seem agreed that there was an "absence of measured data to the contrary," and that the "'urban place' population" criterion was used. Although the precise meaning of "'urban place' population" was questioned by petitioners, respondent has informed us that the term was taken from the 1960 census, and that it was intended to mean what "place" population means in the 1970 census. The 1970 "place" population of Providence was 170,000; hence,

the Priority III classification. We accept the Administrator's interpretation of his own regulation. Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965).

The harder question is whether the regulation goes beyond statutory authority. Petitioners argue that it is irrational, since

> Air pollutants, by their nature, do not respect political boundaries, so that two cities, closely juxtaposed, would have nearly the same degradation of air quality as a single city of the same total population. It is population density and traffic density that are relevant, not the individual city size. Although Providence alone has a population of 170,000, the metropolitan Providence area contains the immediately contiguous cities of Central Falls, Cranston, Cumberland, East Providence, Johnston, North Providence, Pawtucket, Providence, Warwick and West Warwick with a total population of over 570,000.

Whatever the facts in Rhode Island, the regulation seems to presume what must, in some places, be fiction: that, if a region lacks a city of over 200,000, its air is relatively pure in the absence of measured data to the contrary. 40 C.F. R. § 51.3(b)(2). The air over a region containing a dense population, much industry, but no one city with over 200,000 inhabitants, could, though polluted, be classified Priority III. Recognizing this, the Administrator points to

---

3. Certain other questions relating to the timing of the Massachusetts plan and E.P.A. regulation of vehicular emissions, originally raised before us, were recently resolved by the Court of Appeals for the District of Columbia Circuit. Natural Resources Defense Council, Inc., et al. v. E.P.A., 475 F.2d 968, Order filed Jan. 31, 1973, see 465 F.2d 492 (1st Cir. 1972).

4. The classification system (which is not provided for in the Act, but was devised by the Administrator) is described in 40 C.F.R. § 51.3. In general, it is used to differentiate areas of relatively impure air where improvement of air quality is required (Priority I) from areas of relative purity where the present air quality need only be maintained. 40 C.F.R. § 51.14(a)(1) provides that "Each plan for a region classified Priority I with respect to carbon monoxide, photochemical oxidants . . . shall set forth a control strategy which shall provide for the degree of emission reduction necessary for attainment and maintenance of the national standard for each such pollutant. . . ", while pursuant to § 51.14(d)(3), "For Priority III regions, no air quality data for carbon monoxide . . . and photochemical oxidants need be submitted."

his need to tackle the national problem in a manageable way. Since photochemical oxidants and carbon monoxide are associated with automobiles, and since control may require regulation of the use of automobiles, he says he must concentrate initial control strategies in single, large cities having a centralized government and hence greater capability to regulate traffic.

This may be the only feasible approach. Yet the Clean Air Amendments, on their face, contemplate achieving national standards within the allowable time everywhere, an object which the Administrator's urban place priorities would seem not to achieve. We would be loath to construe the Act as requiring the Administrator to do the impossible; however, without further information we cannot make an informed judgment. We do not accept factual arguments advanced by attorneys in briefs or orally as substitutes for official finding or explanations of the agency. International Harvester Company v. Ruckelshaus, —— F.2d 478 at p. 632 (D.C.Cir. 1973). Without data, either we must conclusively presume that the Administrator is right—a presumption which would reduce judicial review of the question to a formality—or we must have further data from the agency upon which to make a reasoned judgment.

At present, we not only do not know officially and in detail why the agency has adopted an approach which seems *not* to ensure national compliance within the allotted time, we do not know why there remains an "absence of measured data" regarding the extent of photochemical oxidants and carbon monoxide pollution in the MPIAQCR.

In a letter dated June 15, 1971, Mario Storlazzi, Regional Air Pollution Control Director, E.P.A., notified Dr. Joseph E. Cannon, Director of the Rhode Island Department of Health, that the MPIAQCR was classified *Priority I* for carbon monoxide and photochemical oxidants "based on the high population and traffic density in the Providence area. Mr. Daley [Chief, Division of Air Pollution Control, Rhode Island Department of Health] has agreed to monitor the air quality for [these pollutants] in an area of high traffic density during the time period from July 1 to September 30 of this year. The air quality data collected will be used to establish the final classification."

There is no evidence that the data was ever collected. We should know whether it is available today, one and one-half years later, particularly in light of 42 U.S.C. § 1857c–5(a)(2)(C).[5] If the data is still not available, is Rhode Island under a continuing duty to collect it, or will the MPIAQCR retain its Priority III classification forever?

■ The Clean Air Amendments do not expressly require the E.P.A. to provide an explanation of its decisions approving state implementation plans. Compare 42 U.S.C. § 1857h–5(b)(1) with § 1857c–5(f)(2). Nonetheless, the judicial review provision necessarily confers authority to compel such information from the E.P.A. to the extent needed to determine whether the Administrator's action is in accordance with law.[6] *See* Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 419–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (U.S. March 26, 1973); Kennecott Copper Corp. v. Environmental Protection Agency, 462 F.2d 846, 848–850 (D.C.Cir. 1972); Natural Resources Defense Council, Inc. v. Envi-

---

5. This section requires that state plans include "provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator."

6. Under the Administrative Procedure Act, the relevant review standard is whether the Administrator's approval was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Clauses 2(E) and 2(F) of § 706 are inapplicable.

ronmental Protection Agency, 475 F.2d 968 (D.C.Cir. 1973). *See also* Environmental Defense Fund Incorporated v. Ruckleshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 597–598 (D.C.Cir. 1971). International Harvester Company v. Ruckleshaus, 478 F.2d 615 (D.C.Cir. 1973). Appalachian Power Company v. Environmental Protection Agency, 477 F.2d 495, at pp. 506–508 (4th Cir. 1973).

■ We ask the E.P.A. to provide us with a detailed statement of its reasons for adopting 40 C.F.R. § 51.3(b)(2), what efforts have been and are being made to collect data concerning photochemical oxidants and carbon monoxide levels in the MPIAQCR, and elsewhere in Rhode Island, whether or not adequate data is now available, and any other information which the E.P.A. considers might be helpful to this court in reviewing the question.[7]

## II

■ Petitioners claim that Rhode Island's control strategy for nitrogen dioxide will reduce the ambient nitrogen dioxide concentration by only 9.2%, whereas in 1969 the primary standard was exceeded by 26.5%. We need not discuss this argument in detail since we are now informed that the Administrator has announced the impending reclassification of all regions for nitrogen dioxide, based upon findings that the air quality data originally used in assigning classifications to regions significantly overestimated the actual ambient concentrations of nitrogen dioxide.[8]

According to respondent, many regions with air quality better than the nitrogen dioxide air quality standard may have been erroneously classified priority I, and the data which indicated a need in Rhode Island for a 26.5% reduction may have been wrong by as much as a factor of ten. We decline to review this aspect of the plan pending reclassification. United States v. Western Pacific Railroad Co., 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The Administrator shall advise us within thirty days whether, in light of the reclassification, the Rhode Island plan is in compliance with the requirements of the Clean Air Amendments. Should the necessary data still be unavailable, he shall file a status report within said thirty day period.

---

7. We have said in a different procedural context, "In environmental matters particularly, we would hope that the government would realize that courts need the expertise and views of responsible agencies whose programs will be affected, one way or another, by litigation." Silva v. Romney, 473 F.2d 287, 289 (1st Cir. 1973).

8. The Administrator announced, in 37 Fed. Reg. 23085 (October 28, 1972) that:

"As discussed below, regulations are not promulgated at this time to correct deficiencies in control strategies for nitrogen oxides in the following States: Massachusetts, Maryland, Michigan, Missouri, New Jersey, and Texas.

Regulations for the control of nitrogen oxides emissions were proposed for the above six States on June 14, 1972 (37 F.R. 11826). The preamble to those proposed regulations indicated that the air quality data for nitrogen dioxide which was used to classify air quality control regions may be in error, and the Administrator would reassess the classifications and, where appropriate, revise them. After considering the numerous comments on the proposed nitrogen oxides regulations, the Administrator has decided to postpone the promulgation of any such regulations until after the regional classification reassessment. It is the Administrator's determination that this postponement will not substantially delay the control of nitrogen oxides emissions where such control is required.

It is the Administrator's intention to complete the regional classification reassessment and to promulgate nitrogen oxides emissions regulations for stationary sources in the appropriate regions by April 2, 1973. Compliance schedules from sources covered by such regulations will be required by July 1, 1973, which is consistent with the commitments made by the Administrator in proposing the regulations. No change will be made at this time in the Administrator's May 31, 1972, disapprovals of nitrogen oxides control strategies unless supplemental information was submitted by the involved States to correct the deficiencies."

## III

■ Petitioners assert that the Administrator erred in approving the Rhode Island plan since it does not provide for revisions, as required by 42 U. S.C. § 1857c–5(a)(2)(H).

The statutory language is clear:

[The Administrator shall approve the plan if he determines that] it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements.

We think the plan must expressly provide for revision after public hearings on the occasions and under the circumstances described in the federal statute. Congress did not indicate merely that the state, or some state authority, should have a power of amendment. Compare G.L.R.I. §§ 23–25–5(*l*) and 23–25–5(n).[9] The plan was to be approved only if *"it provides* for revision, after public hearings" in two sets of circumstances where revision is mandatory, not merely optional. (emphasis supplied) The Administrator erred in approving a plan which sets forth something less. We see no reason, when Congress has spoken precisely, for the Administrator or us to try to decide whether the state's informal substitute is, in the long run, just or almost as good. Presumably the necessary revision undertaking could be in regulations promulgated by the state director of health, or, if more convenient, the Administrator could promulgate his own regulations as a part of the state plan. § 1857c–5(c).

## IV

■ Petitioners claim that the Rhode Island plan failed to provide the "necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan" required by 42 U.S.C. § 1857c–5(a)(2)(F). Respondent counters that the Rhode Island Plan complied with E. P.A. regulation 40 C.F.R. § 51.20:

Each plan shall include a description of the resources available to the State and local agencies at the date of submission of the plan and of any additional resources needed to carry out the plan during the 5-year period following its submission. Such description, which shall be provided in a form similar to that in Appendix K to this part, shall include projections of the extent to which resources will be acquired at 1-, 3-, and 5-year intervals.

The Rhode Island Plan *described* the available resources and projected further resource acquisition. The question becomes whether 40 C.F.R. § 51.20 is consistent with the statute. An assurance is "the act of assuring . . . something that inspires or tends to inspire confidence . . . the quality or state of being sure or certain: freedom from doubt: CERTAINTY . . ." (Webster's Third New International Dictionary). At first glance, a description does not seem to inspire confidence or provide certainty that the state will have adequate personnel, funding and authority to carry out its plan. Yet given the mechanics of state-federal relations, it is difficult to imagine what sort

---

9. "[The Director shall have the power] to make, issue and amend rules and regulations consistent with this chapter for the prevention, control and abatement and limitation of air pollution, and the enforcement of orders issued hereunder . . . ." § 23–25–5(*l*).

"[The Director shall have the power] to exercise all incidental powers necessary to carry out the purposes of this chapter." § 23–25–5(n).

of guarantee the current Rhode Island executive or legislature could give the E.P.A. to insure that adequate resources would be devoted to the Plan. Petitioner speaks of a "commitment . . . to use all reasonable efforts to obtain these resources from the legislature or from other programs . . . The Governor [should] give his assurance that he will do everything possible to obtain adequate resources, including filing special acts before the state legislature, or if necessary making available the necessary resources from other programs under his control." Such assurances might have a symbolic effect; however, they would have little more, since a governor or even a present session of the legislature cannot make binding commitments on behalf of their successors, nor would such representations seem to be enforceable.

We believe that Congress has left to the Administrator's sound discretion determination of what assurances are "necessary". The Administrator has required the states to describe their re-

sources, doubtless reasoning that review of such an inventory is the best practical "assurances" he can obtain. The Administrator can determine whether the itemized resources together with such federal funds as the Administrator may himself channel to Rhode Island (see 42 U.S.C. § 1857c) will enable the state to carry out the plan. The Administrator might also have asked for a promise by the Governor to use his "best efforts." But we are not prepared to fault the Administrator for deciding that such a gesture would be so lacking in enforceability as to be meaningless. The "necessary assurances" clause seems to us to call less for rhetoric than for the Administrator's reasoned judgment as to the adequacy of resources.

V

Petitioners say the Administrator erred in approving that portion of the Rhode Island plan which permits the state to grant variances.[10] They maintain that § 1857c–5(f) establishes the exclusive variance procedure.[11]

10. G.L.R.I. § 23–25–15. Variances.—
"(a) Upon application and after a hearing the director may suspend the enforcement of the whole or any part of this chapter or of any rule or regulation promulgated hereunder in the case of any person who shall show that the enforcement thereof would constitute undue hardship on such person without a corresponding benefit or advantage obtained thereby.
(b) In determining under what conditions and to what extent the variance may be granted the director shall give due recognition to the progress which the person requesting such variance shall have made in eliminating or preventing air pollution. In such a case the director shall consider the reasonableness of granting a variance conditioned on the person's affecting a partial abatement of the pollution or a progressive abatement thereof or such other circumstances as the director may deem reasonable. No variance shall be granted to any person applying therefor who is causing air pollution which creates a danger to public health or safety.
(c) Any variance granted hereunder shall be granted for such period of time, not exceeding one (1) year as the director shall specify, but any variance may

be continued from year to year. No variance shall be construed as to relieve the person receiving it from any liability imposed by law for the commission or maintenance of a nuisance nor shall there be any appeal from a denial of a variance."

11. "(f)(1) Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicability of such requirement to such source (or class) for not more than one year. If the Administrator determines that—
(A) good faith efforts have been made to comply with such requirement before such date.
(B) such source (or class) is unable to comply with such requirement because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time.
(C) any available alternative operating procedures and interim control measures

The Rhode Island variance provision as it now stands should have been disapproved as a part of that state's plan. The statute tells us that a state plan implementing a national primary air quality standard is to provide "for the attainment of such primary standard as expeditiously as practicable but [subject to subsection (e), providing for a possible later two-year extension] in no case later than three years from the date of approval of such plan." § 1857c–5(a)(2)(A). Secondary standards are to be implemented within "a reasonable time" as specified in the plan. A plan must include "emission limitations, schedules and timetables for compliance with such limitations, and such other measures as may be necessary to *insure attainment and maintenance* of such primary or secondary standard . . ." § 1857c–5(a)(2)(B). [Emphasis supplied.]

▆ A state's implementation plan must therefore provide for two periods of time: an earlier period during which attainment of primary standards is to be achieved as expeditiously as practicable, but in no case later than three years; and a later period after which standards, having been attained, are to be maintained. We shall consider the Rhode Island variance provision as it applies to each of the two periods (bearing in mind that neither the variance provision itself nor the Rhode Island plan, as presently written, make any distinction between them).

a. *The period after mandatory attainment of standards.*

▆ Under the variance provision, the Rhode Island director of health is authorized, from year to year, to exempt polluters from state emission limitations, schedules and timetables. Were this power to be exercised liberally after the mandatory attainment dates, he could, at his pleasure, grant exemptions which would render maintenance of standards impossible. His retention of such extensive discretion is inconsistent with the federal statute and its stated objectives. It is plain from the legislative history that the expeditious imposition of "specific emission standards" and their "effective enforcement" were primary goals of the Clean Air Amendments. Report No. 91–1146, U.S. House of Representatives, 91st Cong.2d Sess., pp. 1, 5 (1970), U.S.Code Cong. & Admin.News, p. 5356. The Congressional

have reduced or will reduce the impact of such source on public health, and

(D) the continued operation of such source is essential to national security or to the public health or welfare,

then the Administrator shall grant a postponement of such requirement.

(2)(A) Any determination under paragraph (1) shall (i) be made on the record after notice to interested persons and opportunity for hearing, (ii) be based upon a fair evaluation of the entire record at such hearing, and (iii) include a statement setting forth in detail the findings and conclusions upon which the determination is based.

(B) Any determination made pursuant to this paragraph shall be subject to judicial review by the United States court of appeals for the circuit which includes such State upon the filing in such court within 30 days from the date of such decision of a petition by any interested person praying that the decision be modified or set aside in whole or in part. A copy of the petition shall forthwith be sent by registered or certified mail to the Administrator and thereupon the Administrator shall certify and file in such court the record upon which the final decision complained of was issued, as provided in section 2112 of Title 28. Upon the filing of such petition the court shall have jurisdiction to affirm or set aside the determination complained of in whole or in part. The findings of the Administrator with respect to questions of fact (including each determination made under subparagraphs (A), (B), (C), and (D) of paragraph (1)) shall be sustained if based upon a fair evalution of the entire record at such hearing.

(C) Proceedings before the court under this paragraph shall take precedence over all the other causes of action on the docket and shall be assigned for hearing and decision at the earliest practicable date and expedited in every way.

(D) Section 1857h–5(a) of this title (relating to subpoenas) shall be applicable to any proceeding under this subsection."

intent could too easily be frustrated by the existence of open-ended exceptions. Sources of pollutants should either meet the standard of the law, or be closed down. Report No. 91–1196, U.S. Senate, 91st Cong.2d Sess., p. 3 (1970).

■ Congress's intention to restrict individual exemptions is further reflected in its enactment of § 1857c–5(f). That section with its precise standards, its limitation of postponements to not more than one year, and its provision for judicial review, would be meaningless if much less restricted state variance machinery, nowhere authorized by the federal statute, were simultaneously to exist. We think Congress meant § 1857c–5(f) to be the exclusive mechanism for hardship relief after the mandatory attainment dates.

■ We have, of course, not yet arrived at those dates, and from the Administrator's argument and brief, we do not understand that he necessarily endorses utilization of state variance machinery after that time. But a state plan must provide not only for the present preparatory period; it must ensure both the attainment and the maintenance of standards. The Administrator may not approve a plan, or a portion thereof, which fails to deal appropriately with both objects.

The Administrator contends that the danger of indiscriminate variances is avoided by his own regulations requiring each state and local variance to be treated as a "revision" of the state plan. 40 C.F.R. § 51.32(f). "Revisions" are not to be considered part of a plan until approved by the Administrator. 40 C. F.R. § 51.6. The Administrator's regulations prohibit a state or local agency from granting "any variance of, or exception to, any compliance schedule" if it will prevent or interfere with timely attainment or maintenance of a national standard. 40 C.F.R. § 51.15. They further provide that § 1857c–5(f) postponement procedures are not necessary unless a state's "determination to defer the applicability of any portions(s) of the control strategy with respect to such source(s)" will prevent timely attainment or maintenance of a national standard. 40 C.F.R. § 51.32(f).

These regulations, however, insofar as applicable in the post-attainment period, substitute a less rigorous procedure for the one enacted by Congress. Had Congress meant § 1857c–5(f) to be followed only if a polluter, besides violating objective state requirements, was shown to be preventing maintenance of a national standard, it would have said so. To allow a polluter to raise and perhaps litigate that issue is to invite protracted delay. The factual question could have endless refinements: is it the individual variance-seeker or others whose pollution is preventing maintenance of standards? See e. g., Getty Oil Company v. Ruckelshaus, 342 F.Supp. 1006 (D.Del. 1972), remanded with directions, 467 F. 2d 349 (3rd Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), where *Getty* raised this issue in various forums. We hold that the only recourse provided those seeking postponements of a state's emission limitations after the mandatory deadlines is the restricted provisions of § 1857c–5(f).

■ We do not say that a state plan may not provide, during the post-attainment period, for minor state and local deferral procedures, such as by brief postponement of the effective date of abatement orders. Some flexibility may be allowed for mechanical breakdowns and acts of God. Any such procedures would, however, have to be limited to specific time periods measured in weeks or a few months, and would have to contain standards and controls precluding abuse.

b. *The period before the date or dates set for mandatory attainment of standards.*

Whether states may defer control strategy *prior* to the mandatory compliance dates—by variance, postponement or otherwise—is more difficult. While

one may contend that § 1857c–5(f) must remain the exclusive deferral mechanism, we doubt that Congress intended altogether to preclude the Administrator from approving plans containing reasonable state deferral mechanisms during the preliminary period. The provision for a three-year grace period, followed by the possibility of a further two-year extension, indicates that Congress did not expect immediate achievement of standards. A state plan must provide for attainment of primary standards "as expeditiously as practicable but . . . in no case later than three years from the date of approval . . .", and of secondary standards "within a reasonable time" as stated in the plan. § 1857c–5(a)(2)(A).

A state plan may well establish emission limitations or other requirements during the preliminary period which one or more sources simply cannot initially meet. A postponement under § 1857c–5(f), besides being limited to only one year, would require meeting a stricter standard than is suggested by the "as expeditiously as practicable" language § 1857c–5(a)(2)(A). We can see value in permitting a state to impose strict emission limitations now, subject to individual exemptions if practicability warrants; otherwise it may be forced to adopt less stringent limitations in order to accommodate those who, notwithstanding reasonable efforts, are as yet unable to comply.

The Administrator sees his power to allow such exemption procedures as deriving from the "revision" authority in § 1857c–5(a)(3). We tend to view it more as a necessary adjunct to the statutory scheme, which anticipates greater flexibility during the pre-attainment period. We do not doubt the Administrator's power to approve reasonable mechanisms for state and local deferrals of control strategy, provided they cease before the mandatory compliance date and the individual variances are not granted without his specific approval.

Nothing we say here is to suggest that the Administrator may permit such deferral mechanisms to threaten attainment of full compliance within the mandatory time period, or sooner if practicable. We merely hold that the Administrator has discretion—as he does not after the mandatory dates—to permit state and local deferral mechanisms not inconsistent with national objectives.

(c) *Disapproval of the variance provision*

The Administrator, in arguing the related issue of Rhode Island's overly broad abatement-order laws (*infra*), asserts that he is powerless to remedy deficiencies in state laws:

> Even if the Administrator disapproved the enforcement authority of Rhode Island, there would be no substantive corrective action which he could take to remedy the deficiency. All that he could do would be to publish a disapproval notice in the Federal Register. Elimination of the economic and technical feasibility considerations from the formulation of state enforcement orders would require a revision of the statutory authority of the Department of Health, to-wit, Sections 23–25–5(h) and 23–25–8(a). However, there is no authority provided in the Clean Air Act which would permit the Administrator to accomplish this. Admittedly, if a State fails to submit a satisfactory implementation plan, the Administrator is directed to promulgate regulations setting forth a plan for that State. Section 110(c), 42 U.S.C. sec. 1857c–5(c). It is doubtful that Congress ever intended this provision to be used by the Administrator to revise the basic statutory authority of state agencies.

We do not accept these protestations of helplessness. Of course, the Administrator cannot repeal the state laws. He is specifically empowered, however, to disapprove not only a state implementation plan, but "any portion thereof" (§

1857c–5(a)(2) and § 1857c–5(c)); and he "shall . . . promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if . . . (2) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section, . . . ." § 1857c–5(c).

■■■■ We hold that these statutory provisions not only empower, but also require, the Administrator to disapprove state statutes and regulations, or portions thereof, which are not in accordance with the requirements of the Clean Air Amendments. Congress plainly intended the federal statute and regulations promulgated thereunder to take precedence over state laws and regulations. By enabling the Administrator to insert his own regulations in a state plan, it provided him with the needed authority to substitute appropriate provisions for inappropriate ones. Thereafter, as legal components of the state plan, the Administrator's regulations may be both federally and locally enforced; violations thereof are violations of a state plan. § 1857c–8(a)(1); see §§ 1857c–7(d)(1), 1857c–9(b).

■■■■ We disapprove the Administrator's practice of approving defective state laws or regulations as "surplusage". The result will be confusion in the minds of state authorities and citizens, and, most likely, unnecessary litigation. The Administrator's primary enforcement powers are triggered by violation of "any requirement" of a state plan. § 1857c–8. It is therefore critical that the plan as finally approved (and as supplemented by the Administrator's regulations forming part thereof) sets forth precisely what is required. If it does not, enforcement efforts in later years may be seriously hampered.

With respect to the Rhode Island variance provision, the Administrator is directed to take the following action:

The Administrator shall publish his disapproval of the portion of the Rhode Island implementation plan consisting of the variance statute (G.L.R.I. § 23–25–15) insofar as the statute permits the granting of any variance after the federal compliance dates for attainment of national primary and secondary standards (except minor deferrals as hereinabove described); insofar as it permits the granting of any variance prior to these dates not first approved by the Administrator; and insofar as it permits the granting of any variance other than one conforming to requirements set forth in regulations to be promulgated as part of the Rhode Island plan by the Administrator. After issuing such disapproval, the Administrator shall promptly promulgate regulations, as part of the Rhode Island plan, specifying the limited terms, conditions and circumstances under which state variances may still be issued. Such terms, conditions and circumstances shall be consistent with this opinion and may include additional more restrictive provisions as deemed appropriate by the Administrator.

## VI

Petitioners' sixth argument, also relating to alleged defects in the Rhode Island variance procedure, is controlled by what we have already said on the subject.

## VII

Petitioners contend that two provisions of the Rhode Island Clean Air Act, which are part of Rhode Island's air pollution implementation plan, violate the federal statute by permitting the state air pollution director to consider economic and social factors, and technical feasibility in issuing abatement orders.[12]

12. G.L.R.I. § 23–25–5(h) grants the director power "to issue, modify, amend or revoke such orders prohibiting or abating air pollution as are in accord with the purposes of this chapter and the rules and regulations promulgated hereunder. In making the orders hereunder authorized, the director shall con-

Both sides seem agreed that the Clean Air Amendments of 1970 rejected consideration of these factors in determining whether violators should be made to comply with the law. Report No. 91-1196, U.S.Senate, 91st Cong., 2d Sess., p. 3 (1970); Hearings, "Implementation of the Clean Air Act Amendments of 1970, Pt. I," U.S.Senate, Subcommittee on Air and Water Pollution, Committee on Public Works, 92nd Cong., 2d Sess., p. 21 (1972); Hearings, *supra at* 277, 312.

Respondent's defense is that "insofar as these sections are not required as part of the State's implementation plan, they are surplusage as they relate to the Clean Air Act. Insofar as they might be inconsistent with the Clean Air Act, they are a nullity . . ."

■ This response is not sufficient. To the extent that G.L.R.I. §§ 23-25-5(h) and 23-25-8(a), as now worded, are inconsistent with the federal statute, they must be disapproved.

The same considerations and limitations which we have discussed at length with respect to variances apply generally to abatement orders.

During the post-attainment period, the Rhode Island director must be guided in the issuance of orders by the objective requirements of the state's implementation plan. He may not exercise discretion, based on economic and social factors and on notions of technical feasi-

bility. Postponements may only be allowed as permitted in laws or regulations hereinafter approved or promulgated by the Administrator providing for very brief grace-periods not to exceed several months. Any greater deferral of enforcement must be achieved, if at all, through § 1857c-5(f).

Prior to the attainment dates greater discretion may be allowed by the Administrator in the issuance and timing of orders. We leave to the Administrator the promulgation of suitable regulations, to become part of the Rhode Island plan, indicating the standards to be followed by the Rhode Island director when acting under the Rhode Island laws. Any substantial deferrals of control strategy will, as with variances, require approval of the Administrator.

The Administrator's disapproval of the two Rhode Island statutes, as written, which shall be published, shall follow a format generally similar to that set forth above for disapproval of the variance statute. Suitable detailed regulations consistent herewith and with the Clean Air Amendments shall thereafter be promulgated and made part of the Rhode Island plan.

### VIII

■ We disagree with petitioners' final argument that G.L.R.I. § 23-25-9 [13] fails to comply with 40 C.F.R. § 51.-

sider all relevant factors including, but not limited to, population density, air pollution levels, the character and degree of injury to health or physical property and the economic and social necessity of the source of air pollution."

G.L.R.I. § 23-25-8(a): "If any person is causing air pollution and if after investigation and hearing the director shall so find, he may enter an order directing such person to adopt or to use, or to operate properly, as the case may be, some practicable and reasonably available control system or device or means to prevent such pollution, having due regard for the rights and interests of all persons concerned. Such order may specify the particular control systems, device or means to be adopted,

used or operated; provided, however, where there is more than one such practical and reasonably available systems or means such order shall give to the person complained of the right to adopt or use such one of said systems or means as he may choose. The order shall specify the time within which such system or means shall be adopted or used or such operation thereof shall be commenced. Such time may be extended by the director in his discretion from time to time upon application being made by such person, and any such order may upon like application from time to time be modified in any other particular not inconsistent with the provisions hereof."

13. "Any person who shall adopt or use and who shall properly operate a sys-

18(d).[14] § 23–25–9 appears to refer to situations where a person is ordered by the Director to adopt, use or properly operate an air pollution control device pursuant to § 23–25–8. It would appear not to refer to the case envisioned by 40 C.F.R. § 51.18 where the Department of Health approves the construction or modification of stationary sources under § 23–25–5(k). Furthermore, Section 4.1.2 of the Rhode Island plan states that "Approval of any construction, installation or modification shall not affect the responsibility of the owner or operator to comply with applicable portions of the control strategy." Regulations 9.5.1 and 9.8.1 of the Rhode Island plan are further evidence that construction and modification approval does not exempt a source from compliance with other regulations.[15]

## THE MASSACHUSETTS PLAN

Petitioners' first three objections to the Massachusetts plan raise substantially the same issues as those discussed above with regard to the Rhode Island plan.

## IX

■ Petitioners argue that Massachusetts has failed to provide the "necessary assurances that the state will have adequate personnel, funding and authority to carry out such implementation plan" as required by 42 U.S.C. § 1857c–5(a)(2)(F). Massachusetts candidly states that it must have additional funds and staff to implement the plan. We have earlier stated, with regard to Rhode Island, that Congress left to the Administrator's sound discretion determination of what assurances are "necessary." The difficulty of a state's forecasting future resources, funds and needs requires that much be left to the Administrator's reasoned judgment; honest data, moreover, and even honest doubts are preferable to empty rhetoric. But we cannot, without knowing more, affirm the Administrator's approval of this portion of the Massachusetts plan which on its face, indicates an inability to provide "necessary assurances." It may be that Massachusetts' statement of inadequate resources is offset by the Administrator's reasonable belief that he will be able to channel sufficient fed-

---

tem or means to prevent air pollution in compliance with an order of the director shall thenceforth as long as such approval or order remains unrevoked or unmodified be deemed to have complied with all orders and determinations of the director issued during such period under the authority conferred upon him by this chapter."

14. "(a). Each plan shall set forth legally enforceable procedures that will be used to implement the authority described in § 420.11(a)(4), which procedures shall be adequate to enable the State to determine whether construction or modification of stationary sources will result in violations of applicable portions of the control strategy or will interfere with attainment or maintenance of a national standard . . . .

(d) Such procedures shall provide that approval of any construction or modification shall not affect the responsibility of the owner or operator to comply with

applicable portions of the control strategy."

15. "9.5 Standards for Granting Approval To Construct, Install or Modify

9.5.1 No approval to construct, install or modify shall be granted unless the applicant shows to the satisfaction of the director that:

(a) The machine, equipment, device, article, facility or air pollution control system is designed and will be constructed, installed or modified to operate without causing a violation of the applicable air pollution control rules and regulations.

(b) The machine [etc.] as constructed, installed or modified does not prevent the maintenance or attainment of any applicable ambient air quality standard.

9.8.1 Any approval given by the director shall continue in effect only as long as the operation of the machine, equipment, device, article, facility or air pollution control system is satisfactory to the director."

eral funds to the state to do the job. *See* 42 U.S.C. § 1857c. It may be that his detailed knowledge of the Massachusetts situation satisfies him that, notwithstanding asserted shortages, the state's personnel and funding, insofar as can now be estimated, will be adequate. We recognize, of course, the difficulties faced by the Administrator were a state adamantly to refuse to provide for sufficient personnel and funding. But matters must be taken a step at a time; and the first step, required by the statute, is for the Administrator to make a reasoned judgment whether, in light of the resources shown to exist, and his best estimate of future federal and state resources, the necessary assurances requirement has been met. And for us to review the Administrator's approval in the present case, we must, in view of the doubts expressed by Massachusetts, have more information.

We direct the Administrator to provide us with a detailed statement of his rationale for concluding from the information in the Massachusetts plan and otherwise in his possession that Massa-

chusetts, notwithstanding the doubts expressed in its plan, has provided "necessary assurances" that it will have adequate personnel, funding and authority to carry out its implementation plan.

### X–XI

Our conclusions with respect to petitioners' objections to Massachusetts' variance procedures [16] are identical to those expressed in our discussion of the Rhode Island plan. We shall not repeat them here (see V, above). The relevant Massachusetts regulations shall be disapproved in the manner and to the extent there described, and suitable regulations thereafter promulgated, as part of the Massachusetts plan, consistent with the requirements and standards which we have described in the case of Rhode Island.

### XII

We agree with petitioners that the Massachusetts plan failed to comply with 42 U.S.C. § 1857c–5(a)(2)(F), which requires each plan to provide,

16. "Regulation 50.1 *Variances*
The Department, upon its own initiative or upon application to it by any person, after due notice and a public hearing, may vary the application of any regulation as it may deem necessary for the public good or to allay undue hardship. Variances, when granted, shall be in writing and shall be for not more than one year. The applicant shall assume all costs such as, but not limited to, the publishing of legal notices incidental to the application for and granting of a variance.
Regulation 2.4 *Criteria of Application*
When, in the opinion of the Department, any facility has a likelihood of causing or contributing to a condition of air pollution, the person owning, leasing, or controlling the operation of the facility shall, upon request by the Department, submit to the Department, plans, specifications, Standard Operating Procedure, maintenance procedure and such other information as may be necessary to determine the adequacy of application in said facility of air pollution control technology. If, after review of said information, the Department determines that the facili-

ty is in need of reconstruction, alteration, or repair to prevent it from causing or contributing to a condition of air pollution said facility may be temporarily continued in operation pending such reconstruction or repair if the person owning, leasing, or controlling the operation of the facility,
(a) demonstrates to the satisfaction of the Department hardship or public need and ·
(b) agrees to submit plans and specifications for reconstruction, alteration, or repair of the facility and proposed Standard Operating Procedure for the reconstructed or altered facility to the Department within an agreed-upon reasonable period of time for the Department's review and approval prior to the intended reconstruction, alteration, or repair and subsequent operation and
(c) indicates his intention to reconstruct, alter, or repair and thereafter to operate the facility in accordance with the plans, specifications, Standard Operating Procedure and maintenance procedure as approved by the Department after submittal."

. . . (ii) requirements for installation of equipment by owners or operators of stationary sources to monitor emissions from such sources, (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this chapter, *which reports shall be available at reasonable times for public inspection* . . . [Emphasis supplied.]

This section, particularly important to insure public participation in the enforcement process, is implemented by E. P.A. regulations 40 C.F.R. §§ 51.10(e) and 51.11(a)(6).[17]

█ Regulation 14 of the Massachusetts Department of Public Health Air Pollution rules states:

Upon request by the Department through direct communication or public notice, any person who owns or operates a stationary emission source . . . (b) shall make periodic reports to the Department on the nature and amounts of emissions from said such source which the Department shall review and correlate for its use in emissions control and exhibit for public information.

As petitioners point out, Regulation 14 does not *require* periodic reports. If the Department does not request such reports, they need not be made. We agree that this discretionary aspect of the

Regulation is in conflict with the Act, and should have been disapproved.

There is a further problem with this aspect of the Massachusetts plan. G.L. c. 111 § 142D is enabling legislation for the Department to implement federal air pollution requirements. § 142D provides, in part, that "The powers, duties and rights of the department in the exercise of air pollution control in districts established under this section . . . shall be as provided in section one hundred and forty-two B." § 142B states:

Personnel of the department may in the performance of their duties under this section, enter and inspect any property, premise, or place, . . . *Any information relating to secret processes, methods of manufacture, or production obtained in the course of such inspection shall be kept confidential upon request.* [Emphasis supplied.]

G.L. c. 111 § 2B contains similar language regarding information obtained during inspections to uncover violations of air pollution emergency orders:

Information relating to trade secrets, secret processes or methods of manufacture or production shall be confidential and shall not be disclosed or received during the course of any such investigation; nor shall such information be used or disclosed in any public hearing under this section.

These statutes suggest that Massachusetts does not have authority to compel public disclosure of emission data.[18]

17. "Each plan shall provide for public availability of emission data reported by source owners or operators or otherwise obtained by a State or local agency. Such emission data shall be correlated with applicable emission limitations or other measures. . . ." 40 C.F.R. § 51.10 (e),

"Each plan shall show that the State has legal authority to carry out the plan, including authority to . . . (6) Require owners or operators of stationary sources to install, maintain, and use emission monitoring devices and to make periodic reports to the State on the nature and amounts of emissions from such stationary sources; also au-

thority for the State to make such data available to the public as reported and as correlated with any applicable emission standards or limitations." 40 C. F.R. § 51.11(a)(6)

18. The Massachusetts plan designates "Administrative Bulletin #71–3" (of the Executive Office for Administration and Finance) as the source of the state's authority to compel public disclosure. This Bulletin requires disclosure of "public" and "quasi-public" records. Emission data is not a "public" record as defined by statute, and the definition of "quasi-public" records excludes "(6) A record containing trade secrets or oth-

That the federal statute specifically intended emission data to become public knowledge is clear from 42 U.S.C. § 1857c–9(c):

> Any records, reports or information obtained under subsection (a) of this section [permitting the Administrator access to emission records] shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or information, or particular part thereof, (*other than emission data*) to which the Administrator has access under this section if made public, would divulge methods or processes entitled to protection as trade secrets of such person, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter or when relevant in any proceeding under this chapter. [Emphasis supplied.]

The Administrator should have disapproved so much of the Massachusetts statutes and regulations forming a part of the state's implementation plan as allow emission reports to be held confidential.[19]

### ORDER

**No. 72–1219** *The Rhode Island Plan*

The Administrator is hereby ordered:

1. To file with the court no later than thirty days from the date hereof information respecting classification of the MPIAQCR requested in Section I above.

2. To notify the court within thirty days from the date hereof, in accordance with Section II, whether, in light of the nitrogen dioxide regional reclassification, the Rhode Island plan is found to ensure compliance with the federal nitrogen dioxide standard. Should the necessary data still be unavailable, he shall file a status report within said thirty day period.

3. Forthwith to disapprove the Rhode Island implementation plan, or portions thereof, in accordance with Sections III, V and VII of this opinion, and to take further action consistent with such Sections and as required under 42 U.S.C. § 1857c–5(c) and other applicable provisions of the Clean Air Amendments.

Copies of filings under (1) and (2) above shall be served upon the petitioners when made. Petitioners may file written responses thereto with the court within ten days thereafter.

**No. 72–1224** *The Massachusetts Plan*

The Administrator is hereby ordered forthwith to disapprove the Massachusetts plan, or portions thereof, in accordance with Sections X, XI, and XII of this opinion, and to take further action consistent with such Sections and as required under 42 U.S.C. § 1857c–5(c), and other applicable provisions of the Clean Air Amendments.

The Administrator is hereby ordered, in accordance with Section IX above, to file with the Court no later than thirty days from the date hereof a detailed statement of his rationale for concluding that Massachusetts has provided the

---

er information obtained on a privileged or confidential basis." However, we note the possibility that (5) might permit the disclosure of such data, since it states: "A record containing investigatory information obtained for the purpose of enforcement or implementation of law [is not a quasi-public record] except to the extent that such record is required by law to be made available to a party other than the state agency having custody thereof." The phrase "required by law" might be construed as

encompassing the requirements of the Clean Air Act. However, we need not resolve this question since G.L. c. 111 §§ 2B and 142B, wholly apart from Administrative Bulletin 71–3, conflict with 42 U.S.C. § 1857c–5(a)(2)(F).

19. We understand that the Administrator disapproved the New Jersey and Vermont plans because of state "confidentiality" statutes similar to those of Massachusetts. *See* 37 Fed.Reg. 10880 and 10899.

"necessary assurances" required by 42 U.S.C. § 1857c–5(a)(2)(F). A copy of this statement shall be served upon the petitioners when made. Petitioners may file written responses thereto with the court within ten days thereafter.

So ordered.