**NATURAL RESOURCES DEFENSE**
**COUNCIL, INC., et al.,**
**Petitioners,**

**v.**

**UNITED STATES ENVIRONMENTAL**
**PROTECTION AGENCY,**
**Respondent.**

**Nos. 320, 321, Dockets 72–1728, 72–2165.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1974.

Decided March 13, 1974.

Richard E. Ayres, Washington, D. C., for petitioners.

Henry J. Bourguignon, Dept. of Justice, Washington D. C. (Wallace H. Johnson, Asst. Atty. Gen., Edmund B.

Clark, and Martin Green, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen. and Judith A. Gordon, Asst. Atty. Gen., State of New York, for amicus curiae, State Commissioner, on the brief.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

The petitioners[1] seek a review of the approval given by the Administrator of the Environmental Protection Agency (EPA), to seven of the provisions of the New York air pollution implementation plan.[2] These will be considered seriatim. Since many of the same issues have already been discussed in comprehensive and well reasoned opinions by other circuits in similar suits, see Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 478 F.2d 875 (1 Cir. 1973); Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 483 F.2d 690 (8 Cir. 1973), an extended discussion of them by this court is not called for.

*Public Access to Emission Data*

The petitioners object that the New York plan does not adequately provide for the public availability of emission data. The statute, as amended, requires that a plan provide "for periodic reports on the nature and amount of [stationary source] emissions" and for "availab[ility of such reports] at reasonable times for public inspection," 42 U.S.C. § 1857c–5(a)(2)(F)(iii) and (iv).

■ The New York statute provides that "[a]ny information relating to secret processes, or methods of manufacture, or production obtained in the course of the inspection or investigation [of air pollution sources] shall be kept confidential."[3] Apparently conceding that the statute, without more, would violate the public availability requirement, EPA relies primarily on two letters from the New York Attorney General and a State regulation to demonstrate that the statute will be enforced in a manner not infringing public access to emission data, Yet beyond the obvious questions of the relative force of statute versus regulation and the State's Attorney General's construction of them, the additional gloss provided by these materials is still ambiguous on the critical issue of conflict between demands of confidentiality and public access. The regulation relied on, 6 N.Y.C.R.R. § 200.2, is open to an interpretation that would make public access predominant, because, although on the one hand it preserved confidentiality for "[i]nformation pertaining to manufacture, production or secret processes," it also provides on the other hand that emission data "shall be considered public information." But the New York Attor-

1. Petitioners include individuals and associations representing individuals all of whom are concerned with air quality and all of whom are residents of the New York Metropolitan Air Quality Control Region and are affected by unclean air of the area. Among the associations is the Natural Resources Defense Council, Inc. "NRDC" is arbitrarily used hereinafter to refer to petitioners collectively as a group.

2. The plan was adopted pursuant to § 110(a)(1) of the Clean Air Act Amendments ("Amendments") of 1970, 42 U.S.C. § 1857c–5(a)(1), and submitted to the Administrator on January 31, 1972. The Administrator's approval pursuant to § 110(a)(2) of the Amendments, 42 U.S.C. § 1857c–5(a)(2), appears at 37 F.R. 10882–4 (May 31, 1972), 40 C.F.R. § 52.1670, et seq. Jurisdiction for review in this court is conferred by § 307(b)(1), 42 U.S.C. § 1857h–5(b)(1). To the extent revisions are required in the plan, the Administrator is empowered to make them under § 110(c), 42 U.S.C. § 1857c–5(c). Hereinafter references to sections of the 1970 Amendments are made by U.S.C. citation only.

3. Originally N. Y. Public Health Law § 1277.2(a) (McKinney's Consol.Laws, c. 45, 1971), the provision now appears at N.Y.E. C.L. § 19–0305.2(a) (McKinney's Consol. Laws, c. 43–B, 1973).

ney General does not come down on the side of public access to the data. The construction of the regulation given in his letter of August 1, 1973, is based on the concept that emission reports and "processes and production technology" are "entirely separate and distinct." Were that always the case, a conflict between the demands of confidentiality and disclosure would, of course, never arise. But there are bound to be overlapping or unclear areas in some cases and, where that occurs, the Attorney General's interpretation in his earlier letter of September 13, 1971, also relied on by EPA, says that where the necessity of confidentiality is deemed "overriding," public inspection of emission data will be forfeit. It is our opinion, however, that Congress contemplated that cases of potential overlap might in fact arise, and that in all such cases public disclosure would prevail. 42 U.S.C. § 1857c–9(c); Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 478 F.2d at 893. Cf. 42 U.S.C. § 1857f–6.

■ The ambiguity here is an unnecessary one, and creates an opportunity for polluters to frustrate public disclosure. The EPA should have insisted that New York include, in the portion of the plan dealing with confidentiality, an explicit exception for emission data.

This portion of the plan is remanded to the Administrator for further consideration and revision.

*Variances*

Petitioners also advance the objection that the federal postponement procedures of 42 U.S.C. § 1857c–5(f) were intended to be exclusive, and that, therefore, the Administrator erred in approving that portion of the New York plan which permits the State to grant variances on the ground of practicability. ■■ This question has already been decided by the First Circuit in Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 478 F.2d 875, 884–888 (1 Cir. 1973), by the Eighth Circuit in Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 483 F.2d 690, 693–694 (8 Cir. 1973), and by the Fifth Circuit in Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 489 F.2d 390 (1974). The federal statute, § 1857c–5(a)(2)(A) and (B) contemplates that the implementation plans for separate states, in support of the federal laws for air pollution prevention and control, must go through two stages or periods of time, described by the First Circuit, in the Rhode Island case, as: "an earlier period during which attainment of primary standards is to be achieved as expeditiously as practicable, but in no case later than three years; and a later period after which standards, having been attained, are to be maintained." In brief, they are referred to in chronological sequence, as the attainment or preliminary period and the post-attainment or maintenance period. The attainment period ends at the appropriate mandatory deadline, which for the present case is May 31, 1975. We agree with the holdings in the First and Eighth Circuits that the Administrator has the discretionary power to approve state plans which contained their own deferral mechanism to deal with variances during the preliminary or attainment period, which were not inconsistent with national objectives. We do not agree with the contrary Fifth Circuit holding on this issue. After the mandatory deadlines, however, ". . . the only recourse provided those seeking postponements of a state's emission limitations is the restricted provisions of § 1857c–5(f)," except for such unforeseeable occurrences as mechanical breakdowns and acts of God for which minor state and local deferral procedures could be used, "limited to specific time periods measured in weeks or a few months" and "contain[ing] standards and controls precluding abuse."

The EPA is ordered, as it has conceded it should be, to modify its approval of the New York plan to make it comply.

*Particulate Matter Extension*

NRDC urges reversal of the two-year extension obtained from EPA for achieving the national primary standard for particulate matter in the New York Metropolitan Air Quality Control Region.[4] The real objection of substance is that the plan on its face used the wrong standard in assessing possible strategy alternatives.[5] The Amendments require that before the Administrator grant an extension he must determine that "the State has considered and applied as part of its plan reasonably available alternative means of attaining such primary standard and has justifiably concluded that attainment of such primary standard within the three years cannot be achieved," 42 U.S.C. § 1857c–5(e)(1)(B). Read in conjunction with the requirements of a plan, it is clear that among the "reasonably available alternative means" requiring consideration are "land-use and transportation controls," 42 U.S.C. § 1857c–5(a)(2)(B).

New York considered a wide range of such strategies and controls, unnecessary to catalogue here. But it divided the group of recognized possibilities into two categories, primary and secondary. The former were incorporated into its plan, but the latter were characterized as "strategies that must be further investigated or which require local action now beyond the control of the state." The plan states these are "not strategies which are uneconomical or impractical," but that "they may be socially unacceptable." Petitioners contend that, although New York considered these strategies, it erred in not applying them as part of its plan, and used a wrong standard of possible social resistance to support its rejection instead of the correct test of reasonable availability.

■ As an abstract proposition, there is some merit to petitioners' argument. While social unacceptability may be a factor to consider in determining practicality, it cannot out-weigh or negate the reasonable availability of otherwise practical and economically feasible strategies. In this particular case, however, the facts do not justify reversal of the extension grant.

■ In the first place, it is for the Administrator to determine whether a state has "applied as part of its plan reasonably available alternative means of attaining" the primary standard.

■ While EPA does not argue that the Administrator gave an explanation why none of the secondary strategies, as well as other options not expressly considered by New York, was a "reasonably available alternative means of attaining" the primary standard at issue, we are

---

4. The extension was granted by EPA on May 31, 1972, 37 F.R. 10883, 40 C.F.R. § 52.-1672(b)(1). Extensions may be granted for up to two years if the Governor of the State requests it and the requirements of 42 U.S. C. § 1857c–5(e) are met.

5. Petitioners also claim that the extension should not have been granted because New York did not submit a plan that would "actually result" in attainment of the national primary standard within the unextended period. If NRDC means this literally, its contention is clearly without merit; extensions are only needed if, under certain conditions, a plan that will actually achieve the national standard by the May 31, 1975 deadline is, due to a specified outside cause, made temporarily impossible of immediate fulfillment. 42 U.S.C. § 1857c–5(e). The statement in Natural Res. Def. Counc., Inc. v. Environmental Pro. Agcy., 154 U.S.App.D.C. 384,

475 F.2d 968, 971 (1973) that, to obtain an extension, a state must first submit "a plan which provides for the attainment of the national ambient air quality primary standard by May 31, 1975" is plainly to be followed by the implied caveat: "were it not for the fact that the conditions expressed in 42 U. S.C. § 1857c–5(e) prevent actual compliance." The recitation of these conditions in the subsequent paragraphs of the D.C. Circuit's opinion illustrates what would be manifest in any event. If NRDC means that the workable plan must be capable of attaining national standards by the end of the extension period, it is correct, but in that event it is difficult to understand the relevance of the criticism based on the impracticality of the natural gas strategy. The implementation plan as extended does not rely on a natural gas strategy but rather on boiler and incinerator upgrading to achieve the national standard.

convinced that a remand for that purpose would be a futile exercise. Given the nature of the determination—that no other reasonably available means exist—petitioners' argument might ultimately lead to insistence that the Administrator busy himself disproving a thousand negatives to prove a single positive. There is no reason to make a distinction between explanations for negative exclusions and an affirmative choice. In circumstances of this kind, the petitioners must carry the burden of going forward with a reasonable claim of something important overlooked instead of placing on the Administrator the burden of knocking down all possible objections in advance. If nothing can be done until everything is explained, the mandate of the statute will never be translated into accomplishment.

■ Petitioners have not met the preliminary burden to make further explanation necessary. Most of the alternatives which they assert should have been included are of potential value in improving air quality in the long-run, but they would foreclose the possibility of achieving the May 31, 1975 deadline. That is the sole narrow criterion in judging extensions. For example, the gradual elimination of steam power plants from polluted areas of the city, and requiring new construction to meet energy efficiency standards, do not present reasonably available or timely means. Even conceding some marginal impact of such proposals on the 1975 target, the concept of reasonableness contemplates a weighing of slight impact against probable costs. One of the proposals urged by the petitioners, altering the electric rate structure to reduce power demands, might conceivably have a significant impact in meeting the

deadline, but the petitioners have not even attempted a preliminary showing that this would be the case, such as evidence that the power demand is sufficiently elastic, or the overall particulate pollution adequately sensitive. Further, we note that rate structure changes are often time-consuming and themselves replete with reasonableness considerations. We, therefore, hold that the mere conclusory assertions presented here are not sufficient.[6]

EPA's action in granting an extension of two years is affirmed.

*Primary Standard for Sulphur Oxides*

■ NRDC argues that the New York plan does not insure that air over New York City, which, at times of prevailing westerly winds, is affected by unclean air which had been over New Jersey, will attain the national primary standard for sulfur oxides, as required by 42 U.S.C. § 1857c–5(a)(2)(A), because the plan is based upon certain incorrect factual assumptions related to the New Jersey plan.

New Jersey limits the sulphur content of commercial fuel oil, depending on its grade, to .2% or .3% by weight. New York's plan limits the sulphur content to .1% by weight; this New York restriction applies both to fuel oil and coal. New Jersey's plan, however, limits the sulphur content of coal to 2% but provides for liberal exceptions with higher percentages. New York takes the position that unless New Jersey imposes restrictions as stringent as its own, New York will not be able to meet the national primary standards. EPA has assumed that the restriction on coal would bring about a discontinuance in its use

---

6. We note also that ordering a full explanation of why various possible strategies were not applied in this plan would create a substantial burden not only in this case but in a multitude of other extensions under review. Petitions to review plans in all fifty states, we are told, have been filed in all eleven circuits. Many of these will undoubtedly urge reversals of extension grants. The approach

taken as to this issue is simply an application of the general approach to the subjects under review here: further explanation is called for only when the petitioner has shown the existence of a substantial question about the Administrator's actions. This is the procedure adopted by the First Circuit as well. 478 F.2d at 879 n. 2.

and that coal burning power plants would convert to oil-fired boilers. EPA rejected the simple rollback calculations relied on by New York in favor of those resulting from its own more sophisticated and presumably more accurate computer diffusion models, but its conclusions, particularly under circumstances of petroleum shortages, are unpersuasive and unrealistic. The assumption that all power plants would convert to oil has been demonstrated by NRDC to be invalid, and we do not understand EPA to deny it, although the agency does minimize its importance. Upon such a showing by petitioners and the failure of EPA to provide an adequate explanation, remand for further consideration by EPA is required. Without anticipating its actual response, EPA should, through reference to valid and persuasive supporting evidence at least: (1) explain why, despite present appearances, the original assumptions were valid; or (2) show how the particular change in assumptions necessary to make the model valid cannot be significant enough to alter its substantive results; or (3) re-do a full-scale diffusion model analysis on a valid range of assumptions demonstrating that the plan would succeed. If a satisfactory response cannot be made to at least one of the foregoing, EPA should disapprove this aspect of the plan.

This point is remanded to EPA for further consideration.

*Intergovernmental Cooperation*

■ Petitioners argue that the requirement for "adequate provisions for intergovernmental cooperation," 42 U.S.C. § 1857c–5(a)(2)(E), was not met by the New York plan, even though it has provided for exchange of information with other states and has designated an official coordinating agency (Interstate Sanitation Commission) for the New York-New Jersey-Connecticut Air Quality Region. Petitioners evidently feel that only "binding and enforceable agreements" between states would provide the requisite assurances. We reject this contention, as did the Eighth Circuit in Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 483 F.2d at 692–693, and find sufficient compliance. Beyond the Eighth Circuit's discussion we add only that the retention in 1970 of Congress' *consent* to interstate compacts and a direction that the Administrator *encourage* such agreements, 42 U.S.C. § 1857a(a) and (c), indicate that such arrangements are intended to be voluntary. The exchange of information provision and EPA's own revision power provide adequate coordination measures for meeting, as they may arise, the interstate controversies petitioners fear.[7]

EPA's ruling on this issue is affirmed.

*Source Permits*

The petitioners object to that portion of the New York plan which allows construction without prior review of a project's potential interference with State implementation plan requirements and attainment or maintenance of national air quality standards. The Administrator agrees that a revision of this portion is called for; otherwise the New York procedure would violate the timing requirements of 42 U.S.C. § 1857c–5(a)(2)(D) and § 1857c–5(a)(4). The

7. To the extent that the petitioners are concerned with the effect of polluted air over New Jersey moving over to and merging with New York air, it is New Jersey's plan and its requirements that should be the target of petitioners' attack rather than New York's, insofar as the results of the prevailing west to east movement of air are involved. The plan requirements should impose "[m]easures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State . . .," 42 U.S.C. § 1857c–5(a)(2)(E).

revision must insure that any source to which 42 U.S.C. § 1857c–5(a)(4) applies will be subject to review *prior* to construction, so that any provisional arrangements, which would temporarily or permanently circumvent such review, may be eliminated.

New York is also agreeable to amending the plan in this regard, and the issue is remanded in order that the appropriate changes can be made.

NRDC in its brief also raised two other objections to the New York source permit scheme, apart from its allowance of provisional permits, these two relating to possibly inadequate provision of information on construction to public officials, and to certain very narrow exemptions from permit requirements; at argument, however, we understood NRDC, in light of the cooperative attitude of EPA and the State with respect to source permits, not to be pressing these additional objections, which in any event we did not find persuasive.

*Personnel and Funding*

NRDC further claims that the New York plan does not provide "necessary assurances that the state will have adequate personnel, funding, and authority to carry out such implementation plan," 42 U.S.C. § 1857c–5(a)(2)(F)(i). This brings to the surface the troublesome question of whether the principal financial burden of achieving clean air will rest upon the several states or upon the federal government. This section assumes that each state will furnish the organization and provide the space and equipment to effectuate its plan. As is likely in the cases of other states, New York candidly says, "[c]urrently, both the state and local agencies are under tight budgetary restrictions, and support for further staff and services at this time is unlikely. Increased federal support to the state's program is essential." The only

steps outlined to bridge the admitted fiscal gap are plans to use "the present work force" more efficiently "to compensate for the shortage of staff," but there are no assurances, or even expressions of hope that such actions will be sufficient to eliminate the discrepancy between resources and needs.

The present posture of this aspect of the plan is thus identical to that confronting the First Circuit with regard to the Massachusetts plan, 478 F.2d at 890–891. Along with that Circuit, we recognize the practical side of this issue, including "the difficulties faced by the Administrator were a state adamantly to refuse to provide for sufficient personnel and funding," *id.*, at 891. We also agree "that Congress left to the Administrator's sound discretion determination of what assurances are 'necessary', " *id.*, at 890, and that the Administrator was realistic in concluding that an inventory of state resources constitutes "the best practical 'assurances' he can obtain," *id.*, at 884. Finally, we are in full accord with the comment that "[t]he 'necessary assurances' clause seems . . . to call less for rhetoric than for the Administrator's reasoned judgment as to the adequacy of resources," *id.*, at 884. But while an affirmative statement that a state will use its best efforts is not required, a plan which provides only a negative statement that resources are inadequate cannot be approved. A further exploration, with the appropriate officials, of the State's resources and a study of their availability in implementation of the State's plan may be needed.

Accordingly, we direct the Administrator to provide this court with a detailed statement of his rationale for the conclusion he reached from information at hand or gained from such a restudy of state resources that New York has provided the necessary assurances that it has adequate personnel, funding and authority to carry out its implementation plan.