**FRIENDS OF THE EARTH et al.,**
Petitioners,

v.

**The U. S. ENVIRONMENTAL PROTEC-
TION AGENCY and Nelson Rockefel-
ler, in his capacity as Governor of New
York, Respondents.**

**No. 895, Docket 73-2038.**

United States Court of Appeals,
Second Circuit.

Argued April 24, 1974.

Decided July 1, 1974.

Anthony Z. Roisman, Washington, D. C. and David G. Hawkins, Natural Resources Defense Council, New York City (Berlin, Roisman & Kessler, Washington, D. C., Cullen Phillips, David Schoenbrod, Robert Rauch and Tom Powers, Law Student Assts., Natural Resources Defense Council, New York City, on the brief), for petitioners.

Lloyd S. Guerci, Washington, D. C. (Wallace H. Johnson, Asst. Atty. Gen., Raymond N. Zagone, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent, Environmental Protection Agency.

James P. Corcoran, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Irving Galt and Philip Weinberg, Asst. Attys. Gen., on the brief), for respondent, Governor of the State of New York.

Before LUMBARD and HAYS, Circuit Judges, and JAMESON, District Judge.[*]

LUMBARD, Circuit Judge:

Pursuant to § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 1857h–5(b)(1), petitioners, a group of environmental and public interest organizations concerned with the quality of New York's air, ask this court to review the approval of New York's transportation control plan for the New York City metropolitan area by the Administrator of the Environmental Protection Agency (EPA). We grant review in part and deny review in part.

I.

By enacting the Clean Air Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676, Congress amended the Clean Air Act, 42 U.S.C. §§ 1857–1858a, to require that states meet national standards for air quality within a few years. Briefly stated, under § 109 of the Act, 42 U.S.C. § 1857c–4, the Administrator is to promulgate national primary ambient air quality standards and national secondary ambient air quality standards. Primary standards are for protection of the public health, while secondary standards are for protection of the public welfare. On April 30, 1971, the Administrator promulgated primary standards for six air pollutants—particulate matter, sulfur oxides, nitrogen dioxide, carbon monoxide, hydrocarbons, and photochemical oxidants. Under § 110 of the Act, 42 U.S.C. § 1857c–5, the states after notice and public hearings were to adopt and submit to the Administrator, within nine months after promulgation of an air quality standard, a plan to implement the standard. Primary standards were to be implemented as expeditiously as possible but in any case within three years of the Administrator's approval of the plan; secondary standards were to be implemented within a reasonable time. The Administrator can extend the period for meeting a primary standard by two years, upon application of the governor of the state, if certain sources of emissions are unable to comply with the requirement because necessary technology or alternatives are not available and if the state has considered and applied other reasonably available alternative means of achieving the standard and has justifiably concluded that the standard cannot be implemented in three years. If the state fails to submit a plan meeting the requirements of the Act, the Administrator is empowered to prepare and promulgate his own implementation plan for the state.

At issue here is New York's plan to control transportation within the New York City metropolitan area[1] as part of

---

[*] Senior District Judge of the District of Montana, sitting by designation.

1. This is a portion of the New Jersey-New York-Connecticut Interstate Air Quality Control Region for which the State of New York is responsible. See 40 C.F.R. § 81.13.

its effort to meet the primary standards for carbon monoxide, hydrocarbons, and photochemical oxidants. According to the implementation plan, motor vehicles are responsible for roughly 95 percent of the carbon monoxide emissions, 65 percent of the hydrocarbons emissions, and 50 percent of the photochemical oxidants. The controls on new automobile emissions mandated by § 202 of the Act, 42 U.S.C. § 1857f–1, will only achieve about 40 percent of the reduction in pollutants necessary to fulfill the EPA's primary standards.[2] Therefore, New York's implementation plan had to consider other methods of limiting or dispersing automobile emissions if the standards were to be met.

Earlier this year, we considered a challenge to the principal New York implementation plan, Natural Resources Defense Council, Inc. v. EPA, 494 F.2d 519 (2d Cir. 1974). That plan did not include transportation control measures because the EPA had advised New York and several other states that transportation control plans did not have to be filed until February 15, 1973, and did not have to meet the primary standards until May 31, 1977, allowing for the full two-year extension permissible under § 110. The reason for this advice was that the EPA and the states lacked practical experience in developing transportation control measures that would meet air quality standards. However, this blanket extension was challenged and in Natural Resources Defense Council, Inc. v. EPA, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973), the District of Columbia Circuit held that, although the Administrator had acted in good faith, he had not met the requirements of § 110 in granting the two-year extension. He was ordered to rescind the extension and to require those states which had not yet submitted plans fully complying with § 110 to do so by April 15, 1973. These plans had to meet all requirements of §

110 and be capable of meeting the primary air quality standards by May 31, 1975. If extensions of up to two years were requested, the Administrator had to determine in each case that all requirements of § 110(e) for granting an extension had been met.

The EPA did rescind its extension and the State of New York prepared an implementation plan concerning transportation controls in the New York City area. The plan as adopted has four levels of strategies for reducing pollutants —primary stage strategies which have to be followed if the 1975 deadline is to be met, maintenance stage strategies which are of little effect in meeting the 1975 deadline but necessary to maintaining air quality after 1975, a contingency stage strategy which is required if primary stage strategies fail, and secondary stage strategies which may be beneficial but need further study. The primary strategies as listed by the plan together with the designation letter and number given to each are: vehicle turnover as new automobiles with emission controls replace old vehicles (A–1), retrofitting heavy-duty vehicles with catalytic converters (A–2); thrice yearly emission inspections of all livery vehicles (A–3); semi-annual emission inspections of heavy-duty vehicles (A–4); emission inspections of passenger cars (A–5); training of mechanics (A–6); maintenance and inspection of diesel buses (A–7); retrofitting of light-duty vehicles with catalytic converters (A–8); elimination of leaded gasoline (A–9); reciprocal retrofit and fuel regulations in New Jersey and Connecticut (A–10); enforcement of traffic and parking regulations (B–1A); traffic management (B–1B); selective ban on taxicab cruising (B–1C); reduction in the number of parking places in Manhattan business districts (B–3); expanded use of exclusive bus lanes and increased express bus service (B–5);

2. Presumably this was calculated before the Administrator delayed implementation of the standards required by § 202 until 1976 and set new interim standards. Presumably this percentage would now be lower. See 3 BNA Env.Rep. (Current Developments) 1512 (1973).

staggering of work hours and days (C–8); and citizen participation in the planning process and public information (E–4). A contingency stage strategy would be to ban all private automobiles from Manhattan's business districts (B–2). A table in the margin shows the reduction in air pollutants that New York expected each primary strategy to achieve, although it acknowledged that the success of any one strategy depended on the success of several others.[3]

New York submitted the plan to the EPA on April 17, 1973, and in an accompanying letter Governor Rockefeller requested a two-year extension for meeting the photochemical oxidants standard and an eighteen-month extension for meeting the carbon monoxide standard. The letter explained that achieving the required standards required installing catalytic converters on all existing passenger cars and that it was not technologically feasible to do so since sufficient numbers of converters could not be produced and installed in time and their reliability was unproven. Also it was doubted that the petroleum industry could supply in time sufficient quantities of lead-free gasoline necessary for catalytic converters. Rockefeller added as new primary strategies a requirement that all 1975 model taxis be equipped with a "California package" for emis-

3.                              · TABLE

Impact of Primary Stage Transportation Control Strategies
(1975 Emissions Relative to 1970 Emissions)

PERCENT REDUCTION

| Strategy | Carbon Monoxide Downtown | Midtown | Hydrocarbons-Oxidants Analysis Zone | Nitrogen Dioxide Analysis Zone |
|---|---|---|---|---|
| Stationary source Controls | 4 | 4 | 18* | 11 |
| A-1 | 29 | 48 | 30 | 1 |
| A-2 | 21 | 8 | 6** | — |
| A-3 | Included in Strategy A-1 and A-8 | | | |
| A-4 | Included in Strategy A-2 | | | |
| A-5 | Included in Strategy A-1 and A-8 | | | |
| A-6 | — | — | — | — |
| A-7 | — | — | — | — |
| A-8 | 7 | 10 | 14** | 3 |
| A-9 | — | — | — | — |
| A-10 | Included in Strategy A-1 and A-8 | | | |
| B-1A | 7 | 5 | 2 | 1 |
| B-1B | Included in Strategy B-1A | | | |
| B-1C | 2 | 1 | — | — |
| B-3 | 8 | 2 | — | — |
| B-5 | — | — | — | — |
| C-8 | — | — | — | — |
| E-4 | — | — | — | — |
| TOTAL | 78 | 78 | 70 | 16*** |
| Needed | 78 | | 69 | 32 |

*Hydrocarbon emission· reduction amounts to 8%; however, solvent reformulation will reduce oxidant concentrations by another 10%.

**Older vehicle operators will choose not to retrofit; therefore, reductions in vehicle miles traveled from these classes will occur. Emission reductions are estimated at 10% of the respective class total.

***Nitrogen dioxide emissions reduction through transportaion control measures will not achieve the up to 32% reduction. New York is awaiting guidance from the Environmental Protection Agency on sampling before imposing additional controls on oxides of nitrogen emissions.

sion controls (A–11),[4] a requirement that deliveries to stores, factories, and office buildings be made after business hours (D–3), and a requirement that tolls be imposed on all East River and Harlem River Bridges (B–7).[5]

On June 22, 1973, the Administrator approved New York's plan and granted a nineteen-month extension for meeting both the photochemical oxidants and carbon monoxide standards. 38 Fed.Reg. 16560–61. He also promulgated amendments of 40 C.F.R. § 52.1670, a table that listed the dates by which New York had to meet air quality standards. Another regulation, 40 C.F.R. § 52.1683, was revised to require that New York submit by July 30, 1973 the legislative authority needed to carry out the strategies and by December 30, 1973 the necessary adopted regulations and administrative policies needed to implement such strategies. 38 Fed.Reg. 16567.

## II.

▮ What is the scope of judicial review in this case? For the most part we are concerned with whether the Administrator was correct in his factual determinations. It is settled that judicial review of these determinations made in approving state implementation plans is limited to determining if the findings were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See, e. g., Delaware Citizens for Clean Air, Inc. v. Administrator, 480 F.2d 972, 976 (3d Cir. 1973). In making a finding on this issue a "court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in

judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If the record does not disclose the basis of the Administrator's determination, the court can ask him for a further explanation. Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 420, or if his findings are not sustained in the record, the court can vacate his determination and remand for reconsideration. Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). See Natural Resources Defense Council, Inc. v. EPA, supra, 494 F.2d at 525–526, 527.

## III.

The first challenge, however, is to the legal sufficiency of New York's implementation plan. It is argued that the plan is too vague because the strategies, in particular the reduction in parking strategy, do not indicate precisely what actions will be taken. In addition, it is claimed that the plan does not comply with the requirement of § 110(a)(2)(B) that it contain "emission limitations, schedules, and timetables for compliance with such limitations."

▮ On the first point we agree that the plan is not as specific as it could be. In discussing the parking strategy, the plan says,

Since parking policy is to be the primary strategy for reducing passenger car VMT [vehicle miles traveled] (by

---

4. In postponing the requirements under § 202 of the Act, see note 2 supra, the Administrator of the EPA imposed stricter controls on emissions for 1975 vehicles sold in California than for those sold elsewhere. This new strategy required that 1975 taxis be able to meet these stricter California standards.

5. Implementation of other strategies were later delayed until after 1975 as follows:

Heavy-duty retrofit until December 1976, tolls of East and Harlem River Bridges to December 1976, mechanic training until December 1975, and emission inspection of heavy-duty vehicles until December 1976. Letter from Henry L. Diamond, Commissioner, New York Dept. of Environmental Conservation, to Robert Fri, Acting Administrator, EPA, May 16, 1973.

approximately 50 per cent in the Manhattan business districts), it is estimated that available parking spaces also should be reduced by 30 to 40 per cent. A practical approach to the goal is a strongly enforced, complete ban on on-street parking south of 60th Street in Manhattan during the business day, gradual reduction in the number of off-street parking spaces and a change in pricing policies to discourage passenger car . . . commuting rather than to encourage it. One third to one half of the remaining off-street parking spaces should be relocated to fringe lots along the Hudson riverfront. Jitney service for shoppers will be established between these lots and the business area.

The argument is that this statement and others like it are deficient in that there is no mention of what particular off-street facilities will be eliminated or how they will be selected.

The Administrator, however, has chosen to interpret the Act to allow states to postpone promulgating detailed regulations for several months after submission and acceptance of a plan, here December 30, 1973. The Administrator has said allowing postponement of regulations "does not defer the necessity for the States to choose their strategies and make firm commitments to put them into effect. It merely means that the detailed procedures involved can be approved later. If the plan did not provide adequate assurance that this later stage would be essentially procedural, so that substantial difficulties would not arise then, the plan was not approved." 38 Fed.Reg. 16554.

We think that this interpretation of the requirements of the Act is a reasonable one and that we should defer to the Administrator's judgment. After all,

the Administrator has the difficult and complex job of supervising the implementation of plans to achieve air quality standards in all fifty states plus the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and American Samoa. See 42 U.S.C. § 1857h(d). The Administrator has not been rubber-stamping his approval of state transportation control plans. On June 22, 1973, out of transportation control plans for 43 regions, it was anticipated that all but nine would require some modification by EPA, and 24 would require substantial EPA modification or promulgation. See 38 Fed.Reg. 16554. The Administrator's interpretation requires that there be sufficient commitment and detail so that achievement of the air quality standards are ensured. While New York's plan does not commit itself to banning parking on any particular street, the EPA or a private citizen could in an appropriate enforcement action require New York to implement a plan reducing business district parking by thirty to forty per cent. So long as the plan is detailed enough that the Administrator can determine that the proposed strategies will achieve national air quality standards and there is no reason to believe that the delay in promulgating detailed regulations would interfere with the requirement that such standards be achieved "as expeditiously as practicable," § 110(a)(2)(A)(i), we see no good reason not to allow a state some additional time to submit more specific details of their implementation plan.[6]

█ As far as the alleged lack of schedules for implementation is concerned, suffice it to say that the plan does contain such schedules. While here too there may not be the detail petitioners would like, we think that it is sufficient for the purposes of the Act. Therefore, we do not agree with the petitioners on this point.

---

6. As will be seen below, however, New York did not submit these detailed regulations by December 30. While this failure to comply with the Administrator's order may lead to appropriate enforcement action, we do not think that it contradicts our conclusion that allowing the state a delay of a few months in promulgating detailed regulations is a reasonable interpretation of the Act.

## IV.

■ Petitioners' next challenge accuses the Administrator of making three unjustified assumptions in approving the parking ban strategy which plays a major role in achieving the goal of a fifty per cent drop in passenger car VMT. It is claimed that the Administrator mistakenly assumed that without implementing the strategies the percentage of commuters using the various modes of transportation will remain constant. In particular it is argued that in the past fare increases have always resulted in decreased ridership on mass transit facilities and since the plan makes no provision for maintaining current fares, it is possible that fare increases could cause so many commuters to use their cars despite reductions in parking space that the parking ban strategy will not work. But the plan does not aim at attracting riders to mass transit; it admits that there is no sure way to do that. Rather it aims at compelling them to use other modes of travel besides private automobile by denying them parking space. Increased use of express buses with special highway lanes is intended to provide an accceptable alternative to those displaced. We, therefore, do not think the Administrator acted unreasonably in approving a plan that did not provide for maintaining current mass transit fares.

■ Another argument is that even if there is a reduction in parking spaces, there may not be a great enough decline in passenger car VMT because many commuters will park illegally anyway. The plan does admit that most cars parked on the street in the central business districts are parked illegally, but the plan also provides for stepped-up enforcement of traffic regulations by a paraprofessional staff. We think that the Administrator acted reasonably in concluding that increased enforcement would solve the problem.

Petitioners' most troublesome challenge is that the Administrator assumed that the total supply of parking spaces in the central business districts is currently equal to the total demand. That this may have been assumed appears in an evaluation prepared by the EPA staff for the Administrator where it is said that it is assumed that a fifty percent reduction in parking places will result in a fifty percent reduction in miles traveled by passenger vehicles. Petitioners challenge this by pointing to a New York City intradepartmental memorandum, dated July 13, 1973, which found an average vacancy rate in midtown Manhattan parking garages of about forty-three percent.[7] This means that a reduction in parking spaces may not achieve the fifty percent reduction in passenger car VMT that the plan hoped for. An even greater reduction in parking spaces may be necessary to achieve the desired reduction in VMT.

■ We do not conclude that the Administrator was necessarily in error. The relationship between parking spaces and VMT would appear to depend upon complex and varied factors, including, at least in part, public perception concerning how many parking spaces are available reasonably close to commuter destinations. But we believe that a further explanation by the Administrator is necessary. The petition for review of this point is therefore granted, and this matter is remanded for further explanation by the Administrator on why he concluded that the parking ban strategy would achieve its goals.

## V.

The next challenge is that New York did not give adequate assurances that

7. This memorandum, which was written after the Administrator approved the New York plan, is used by petitioners not to argue that there should be a reopening of the decision as was argued in Hudson River Fishermen's Ass'n v. FPC, 498 F.2d 827, at 829 (2d Cir. 1974), but rather to convince this court in its initial review of the Administrator's decision that he made a clear error in judgment in approving the parking ban strategy.

there would be sufficient funds to implement the plan. Although § 105 of the Clean Air Act, 42 U.S.C. § 1857c, allows the Administrator to make grants to defray part of the costs of achieving national air quality standards, the Act places primary responsibility for providing funds upon the states. Section 110(a)(2)(F)(i) requires that the state plan contain "necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan."

Here the Administrator has not explained how he determined that New York has provided the requisite necessary assurances concerning personnel and funding. The plan does provide a detailed list of what funds and staff will be ʹrequired in implementing the plan but does not say from where these resources will be derived. In his letter accompanying the plan, Governor Rockefeller stated that new funding was required and bluntly said, "Congress has mandated; Congress should provide the necessary funds." We, therefore, cannot tell how the Administrator determined that there were adequate assurances.

■ In Natural Resources Defense Council, Inc. v. EPA, *supra*, 494 F.2d at 527, we faced a similar situation. Adopting the test announced by the First Circuit in Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 890–891 (1st Cir. 1973), we said that this situation calls for the Administrator's reasoned judgment on the adequacy of state resources and directed the Administrator to provide a detailed statement of his rationale in determining that New York had provided the needed necessary assurances on funding and personnel. Since we do not know the basis of the Administrator's determination on this matter, we again direct the Administrator to provide a detailed statement of his rationale on this matter.

### VI.

As noted above, the Administrator granted New York a nineteen-month ex-

tension in meeting the photochemical oxidants and carbon monoxide primary air quality standards in the New York City metropolitan area. Before such an extension can be granted the Administrator must determine that one or more emission sources or class of sources are unable to comply with the plan which implements a primary standard because necessary technology or other alternatives are not available or will not not be available soon enough and that the state has considered reasonably available alternative means of achieving the standard. In addition the Administrator must determine that the remaining parts of the plan will be implemented by May 31, 1975, and that there are reasonable interim standards for those parts that cannot be implemented.

Petitioners do not challenge New York's contention that there will not be sufficient catalytic converters available in 1975 to retrofit all passenger vehicles and heavy-duty vehicles. Instead they argue that New York has not exhausted all reasonably available means of achieving the standards by May 31, 1975. They offer five alternatives: a greater reduction in taxi cruising, increased car pool incentives, control of gasoline sales, elimination of commuter discounts for tolls on Hudson River bridges and tunnels, and expedited imposition of tolls on toll-free Harlem and East River bridges.

■ We faced a similar challenge in Natural Resources Defense Council, Inc. v. EPA, *supra*, 494 F.2d at 524–525, and said there that rather than have the Administrator disprove "a thousand negatives" to conclude that all reasonable alternatives have been explored, that petitioners must carry the burden of going forward with "a reasonable claim of something important overlooked." We think it is clear that three of petitioners' alternatives, increased car pool incentives, elimination of commuter discounts, and imposition of tolls on all bridges, do not meet this burden. There is no showing that these strategies would accomplish anything more than a successful parking ban strategy. Addi-

tionally, ending commuter discounts at Hudson River crossing apparently would have to be done by the Port of New York Authority, an independent organization formed by compact between New York and New Jersey.

A control on gasoline sales, if successful, would undoubtedly result in a decrease in VMT. The Administrator in his determination that an extension was called for did not specifically reject gasoline rationing. The evaluation of New York's plan mentions gasoline rationing along with other alternatives, but states, apparently without support in the record, that once VMT is reduced fifty percent, the remaining VMT contributes little to the carbon monoxide problem.

We would therefore have difficulty in upholding the Administrator's determination on this issue if he had not elsewhere provided an explanation. The EPA considered requiring limitation on gasoline supplies in the plans it proposed for several states whose plans were inadequate. The Administrator concluded that such limitations are not a reasonably available alternative sufficient to prevent an extension since "[t]he possibilities of evasion, the likelihood of noncompliance, and the difficulties of enforcement are too great to make this measure practicable." 38 Fed. Reg. 30632 (Nov. 6, 1973). This explanation is a reasonable one and we see no reason to go through the formality of remanding this case to the Administrator to receive a similarly worded explanation.

Finally, it is suggested that New York could ban all cruising by taxicabs looking for passengers. New York's plan provides for a twenty percent cut in taxi cruising. The plan states that taxicabs contribute almost sixty percent of the vehicle miles traveled in midtown Manhattan and almost half this mileage is cruising without passengers. The plan estimated that a total ban on cruising in midtown could result in as much as a twenty percent reduction in carbon monoxide levels. The plan instead would institute only a partial ban on certain streets and relies on other strategies to achieve the primary standards. The reason a total ban was not instituted was taxi industry pressure. Originally a total ban was proposed, but in a compromise a partial ban was agreed to. The plan states, "The industry acknowledged that they would do almost anything to insure their freedom to cruise."

▮ While such a compromise would be acceptable if national primary air quality standards are achieved, the Clean Air Act does not contemplate allowing extension in achieving the standards merely because reasonably available means are unacceptable to any special group. See Natural Resources Defense Council, Inc. v. EPA, *supra*, 494 F.2d at 524; Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390, 411–412 (5th Cir. 1974). The twenty percent reduction in carbon monoxide mentioned in the plan would go a long way in making up for the unavailability of the retrofitting strategies.

▮ This twenty percent figure, however, may be inflated since the plan says a one or two percent reduction will be caused by a twenty percent reduction in cruising. Furthermore, the requirement that all 1975 model taxis have the "California package" of emission controls conceivably could lessen the environmental impact that a ban on taxi cruising would have. The Administrator gave no explanation concerning this matter in approving the plan, and the EPA staff evaluation report only notes that the Department of Transportation has urged a more drastic ban and states that New York State should consider such a ban "in the event that additional reductions are deemed necessary as the attainment date approaches." Which date, May 31, 1975, or nineteen months later is not made clear, and the EPA has not required that New York consider this matter before the May 31 deadline. We, therefore, must remand this matter for a further explanation by the Administrator on why he determined that a total ban, or a substantially larger ban than twenty per cent, on cruising of tax-

is was not a reasonably available means of achieving primary air quality standards by May 31, 1975.

## VII.

Finally, we are asked to order either the EPA or the State of New York to promulgate the detailed regulations for implementing the plans. Although required by 40 C.F.R. § 52.1683 to submit its legislative authority for carrying out its transportation control plan by July 30, 1973 and its detailed regulations and administrative policy by December 30, 1973, New York has apparently not complied. In November 1973 the Regional Administrator of the EPA sent a letter to Governor Rockefeller requesting a showing that the required legislative authority was not yet needed and requested submission of a new timetable for securing the required legislative authority. No answer was sent. On January 31, 1974, the Regional Administrator renewed this request in a letter to Governor Wilson and also said that the detailed regulations had not been submitted and must be submitted before the end of February or the EPA's previous approval of the plan might be jeopardized. On February 18, Wilson sent a letter to EPA Administrator Russell E. Train saying that New York felt compelled by the energy shortage to delay implementation. Train's reply of March 17 demonstrated that implementing the plan would save gasoline in New York, not expend it. He set before New York the alternatives of complying with its previous plan or attempting to revise the plan by April 15.

On April 1, Wilson raised some objections to EPA criteria for estimating future pollution levels and said he would seek revisions contingent upon getting federal financial assistance, further extensions, and change in the EPA criteria. Wilson also said mass transit aid was necessary. On April 23, Train replied by saying the plan was enforceable until revised and the facts in Wilson's letter would not support a revision any-

way. He answered Wilson's criticism of EPA criteria and said federal funding to aid in implementation would continue. Train agreed that aid to mass transit was desirable but said that it was the responsibility of other federal agencies. He also said that the State could raise funds for this purpose by imposing tolls on all East and Harlem River bridges. Furthermore, he stated that since New York had not demonstrated its resolve to implement the plan, the EPA must take action to assure compliance. For this purpose the matter was referred to the Regional Administrator.

At argument, the EPA joined in petitioners' request that we order New York to comply with the EPA regulation and begin implementing its plan. Although counsel for the respondent Governor did not argue against such an order, we have concluded that we lack jurisdiction to issue such an order. Our jurisdiction here under § 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1), is limited to reviewing the correctness of the Administrator's approval of the state plan. For this purpose, actual compliance with an adequate plan is irrelevant. Congress has provided in the Clean Air Act specific measures for enforcing the plan. Under § 110 the Administrator can promulgate a revised plan if the original plan proves to be inadequate and the state refuses to act. Under § 113, 42 U.S.C. § 1857c–8, the Administrator can bring suit in the appropriate district court to enforce his orders or an implementation plan. Finally under § 304, 42 U.S.C. § 1857h–2, private citizens, subject to whatever constraints the Eleventh Amendment may provide, can bring suit in the district courts to enforce implementation plans. By providing these methods, Congress must have intended that judicial enforcement of implementation plans be instituted in the district courts where a factual record can be developed. Accordingly, we decline to order New York to comply with the implementation plan.

## VIII.

The petition to review is granted to the extent that the Administrator is required to explain further his determinations regarding the parking ban strategy, the necessary assurances concerning funding and personnel, and the twenty percent ban on taxicab cruising. In all other respects, the petition is denied.

So ordered.