The CONNECTICUT FUND FOR the ENVIRONMENT, INC., and the American Lung Association of Connecticut, Inc., Petitioners,

and

City of Middletown, Connecticut, Intervenor,

v.

ENVIRONMENTAL PROTECTION AGENCY, Anne M. Gorsuch, Administrator, Environmental Protection Agency, Respondents,

and

State of Connecticut and Connecticut Business and Industry Association, Inc., Intervenors.

Docket 81–4227, No. 4.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1982.

Decided Dec. 1, 1982.

E. Donald Elliott, Associate Professor of Law, Yale Law School, New Haven, Conn., and Suzanne Y. Langille, New Haven, Conn. (The Connecticut Fund for the Environment, Inc., Daniel Millstone, New Haven, Conn., of counsel), for petitioners.

Francis O'Neill, City Atty. of the City of Middletown, Conn., on the brief, for intervenor.

Diane L. Donley, Washington, D.C. (U.S. Dept. of Justice, Environmental Defense Section, Land and Natural Resources Div., Robert M. Perry, Gen. Counsel, Lydia N. Wegman, Acting Asst. Gen. Counsel, Washington, D.C.), and Jeffrey Fowley, Boston, Mass. (U.S. Environmental Protection Agency, Catherine A. Cotter, U.S. Environmental Protection Agency, Region I, Washington, D.C., Michael P. Thomas, Boston, Mass., of counsel), for respondents.

Robert A. Whitehead, Jr., Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen. of the State of Connecticut, Kenneth N. Tedford, Asst. Atty. Gen., Hartford, Conn.), for intervenor State of Conn.

Joan Z. Bernstein, Washington, D.C. (Wald, Harkrader & Ross, Washington, D.C., Jerry D. Anker, Ann Adams Webster, Cheryl C. Kremzier; New England Legal Foundation, Wayne S. Henderson, Boston, Mass., John Rathgeber, Connecticut Business and Industry Ass'n, Inc., Hartford, Conn., of counsel), for intervenor Connecticut Business and Industry Ass'n, Inc.

Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FEINBERG, Chief Judge:

Petitioners The Connecticut Fund for the Environment, Inc. (the Fund) and the American Lung Association of Connecticut, Inc., and intervenor City of Middletown, Connecticut seek review under the Clean Air Act (the Act) of a final rule of the Environmental Protection Agency (the Agency) approving an amendment to Connecticut's sulfur control regulation 19–508–19. That regulation was issued by the Connecticut Department of Environmental Protection (the Connecticut Department).[1]

---

1. Cases under the Act apparently require use of a bewildering profusion of acronyms, which makes it difficult to remember what the unlikely combinations of capital letters actually mean. In an effort to minimize the use of acronyms in this opinion, we will call the Environmental Protection Agency the "Agency" rather than "EPA", The Connecticut Fund for

The amendment raises from 0.5% to 1.0% the permissible sulfur content in fuel burned by Connecticut industries. The Fund claims that this increase will impede the attainment and maintenance of the National Ambient Air Quality Standards (NAAQSs) for sulfur dioxide ($SO_2$) and for total suspended particulates (TSP) in Connecticut and in neighboring states, in violation of various provisions of the Act. The central question in the dispute is whether the Agency was required to consider the impact of Connecticut's sulfur-in-fuel revision on TSP concentrations in Connecticut. The Agency interprets the Act as allowing it to consider state pollution control plans on a pollutant-specific basis. We cannot say that the Agency's interpretation of the relevant statutory provisions is unreasonable. In addition, we find that the Agency provided the public with adequate notice of the proposed revision. Further, we find that the Agency's determinations with respect to the effects of the sulfur-in-fuel increase on interstate pollution and on $SO_2$ concentrations in Connecticut were reasonable and within the Agency's administrative discretion. Accordingly, we deny the petition for review in all respects.

## I. Statutory Background

The Clean Air Act, 42 U.S.C. §§ 7401–7642 (Supp.1981), charges the Agency with administering a combined federal-state program to control air pollution. Under the Act, the Agency is responsible for promulgating primary NAAQSs to protect public health, 42 U.S.C. § 7409(b)(1), and secondary NAAQSs to protect public welfare, 42 U.S.C. § 7409(b)(2). The Agency has set primary and secondary standards for several pollutants, including $SO_2$ and TSP, the

pollutants at issue in this case.[2] 40 C.F.R. §§ 50.4–50.7 (1980). The Act requires each state to submit a state implementation plan (SIP) for "implementation, maintenance, and enforcement" of these standards. 42 U.S.C. § 7410(a)(1). A SIP must include, among other things, emission limitations for stationary pollution sources, schedules for compliance, and other measures necessary to ensure the attainment and maintenance of NAAQSs. 42 U.S.C. § 7410(a)(2).

Each SIP must be submitted to the Agency Administrator for review. The Administrator must approve a SIP if it conforms to the eleven criteria set by the Act. 42 U.S.C. § 7410(a)(2)(A)–(K). Similarly, the Administrator must approve any revision to a SIP if it meets these eleven requirements. 42 U.S.C. § 7410(a)(3)(A); *Train v. NRDC,* 421 U.S. 60, 79–80, 95 S.Ct. 1470, 1481–1482, 43 L.Ed.2d 731 (1975). If a state fails to submit a satisfactory SIP, the Administrator must promulgate a federal plan for the state. 42 U.S.C. § 7410(c).

Under the Act, primary standards must be attained within three years of a plan's approval,[3] and secondary standards must be attained within "a reasonable time." 42 U.S.C. § 7410(a)(2)(A). If any region of a state fails to meet any NAAQS, that region is designated as a "nonattainment" area for each NAAQS not met. 42 U.S.C. § 7501.

Part D of the Act, 42 U.S.C. §§ 7501–7508, sets stringent requirements for nonattainment areas in order to ensure eventual attainment. A revised SIP must provide for the attainment of the primary NAAQSs no later than December 31, 1982, and for the attainment of both the primary and the secondary NAAQSs "as expeditiously as practicable." 42 U.S.C. § 7502(a)(1). The

the Environment, Inc. the "Fund" rather than "CFE", and the Connecticut Department of Environmental Protection the "Connecticut Department" rather than "DEP". In a further effort to assist the reader, we have appended a glossary dealing with those acronyms we have felt compelled to use.

**2.** The Agency has also promulgated national standards for ozone, carbon monoxide, nitrogen oxide, hydrocarbons, and lead. 40 C.F.R. § 50 (1981).

**3.** The Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676 (codified at 42 U.S.C. §§ 1857–1858a (1970)), envisioned attainment of the NAAQSs by mid-1975. When it became apparent that many states would fail to meet that goal, Congress amended the Act to extend the deadlines. See generally *Connecticut Fund for the Environment v. EPA,* 672 F.2d 998, 1000–01 (2d Cir.1982).

SIP revision required by Part D is referred to as a "nonattainment plan," an odd description since the plan is supposed to assure attainment of a national standard. In addition, the plan must provide for the adoption "of all reasonably available control measures as expeditiously as practicable," and provide for "reasonable further progress" toward attainment in the interim. 42 U.S.C. § 7502(b). Part D leaves to the states the primary responsibility for meeting NAAQSs, and allows states considerable discretion in devising an appropriate mix of emission limitations.

Part C of the Act, 42 U.S.C. §§ 7470–7491, provides for the prevention of significant deterioration (PSD) of air quality in areas with ambient air quality that is better than required by the applicable NAAQS. Part C requires preconstruction review of new and modified major sources, and sets maximum "increments" of clean air that may be consumed by increases in emissions of particulate matter or sulfur dioxide.

## II.  Regulatory Background

In 1972, the Agency approved a Connecticut implementation plan that restricted Connecticut industries to the use of fuel oil with a maximum sulfur content of 0.5%. 37 Fed.Reg. 10,842, 10,856 (1972). Apparently as a result of this emission limit, one of the strictest regulations of the sulfur content of fuel of any state in the nation, Connecticut met the primary and secondary standards for $SO_2$.

In July 1981, the Connecticut Department notified the Agency that it wished to raise the sulfur-in-fuel limit from 0.5% to 1.0% because of increasing price differentials between low and high sulfur fuels. For example, one Connecticut utility company estimated that using the more expensive 0.5% sulfur fuel instead of the 1.0% fuel cost its customers 24 million dollars in the previous year. In August 1981, the Connecticut Department held hearings on the proposed revision; petitioner Fund was present at the hearings and expressed its opposition to the 1.0% plan. The Agency had an extensive air quality modeling analysis prepared to assess the probable effects of a 1.0% sulfur limit on $SO_2$ concentrations in the ambient air of Connecticut and neighboring states. In September 1981, the Agency proposed to approve the 1.0% limit for most sources burning fuel oil.[4]   46 Fed.Reg. 45,378 (1981). After a thirty-day public comment period, the Agency published a final rule in November 1981 approving the 1.0% plan. 46 Fed.Reg. 56,613 (1981). The Fund then petitioned this court for review of this final rule.[5]

## III.  Standard of Review

As a preliminary matter, we note that the Agency has considerable discretion in deciding whether to approve a SIP or a SIP revision. We must uphold the Agency's decision unless it is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Friends of the Earth v. USEPA,* 499 F.2d 1118, 1123 (2d Cir.1974) (quoting 5 U.S.C. § 706(2)(A)). Moreover, it is well settled that on questions of statutory construction, " 'great deference' " must be shown " 'to the interpretation given the statute by the officers or agency charged with its administration.' " *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). As this court recently noted, "[t]he need for flexibility in the administration of [the Act] ... should not be underestimated. We have in the past been careful to defer to EPA's choice of methods to carry out its 'difficult and complex job' as long as that choice is reasonable and consistent with the

---

**4.** The Agency proposed to disapprove the 1.0% sulfur limit for solid fuels such as coal that have a variable sulfur content. 46 Fed.Reg. 45,378 (1981).

**5.** Thereafter, by order of this court, the caption of the case was amended to include the American Lung Association of Connecticut, Inc. as a petitioner. For convenience, we sometimes refer to arguments of the Fund, rather than to arguments of the Fund and the American Lung Association. The City of Middletown was allowed to intervene as a petitioner. The State of Connecticut and an industry association were allowed to intervene as respondents.

Act." *Connecticut Fund for the Environment v. EPA,* 672 F.2d 998, 1006 (2d Cir. 1982) (citing *Friends of the Earth v. USEPA,* supra, 499 F.2d at 1124). Thus, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

## IV. Permissibility of Pollutant-Specific Plans

■ Petitioners claim that the Act requires the Agency to consider the impact of the sulfur-in-fuel revision on the concentration of TSP in the air of Connecticut. Petitioners note that when fuel containing sulfur dioxide is burned, particulates are emitted directly (primary formation) and indirectly by the oxidation of $SO_2$ into sulfate particles as the $SO_2$ travels long distances in the atmosphere (secondary formation). Accordingly, an increase in the sulfur content of fuel burned in Connecticut will necessarily raise the level of particulates in Connecticut's air. Petitioners argue that since Connecticut has not yet attained the national secondary standard for TSP,[6] 45 Fed.Reg. 84,780 (1980), raising the sulfur limit will contribute to an existing violation of the NAAQS for that pollutant. Because the Act expressly provides that state implementation plans, and revisions to such plans, must be designed to ensure the attainment and maintenance of NAAQSs, 42 U.S.C. § 7410(a)(2)(B), (a)(3)(A), the Fund claims that the Agency's approval of the 1.0% plan constituted an abuse of discretion. It does not appear, however, that the 1.0% plan will result in significantly higher levels of TSP in Connecticut's air. Connecticut limits the direct emissions of particulates from the smokestacks of plants that will be burning the 1.0% sulfur fuel. That limitation, found in Conn.Reg. § 19–508–18(d), has not been altered by the revision in the $SO_2$ emission limit.[7] Presumably, then, if Connecticut plants burning the 1.0% sulfur fuel exceed this direct particulate emission limit, they will be forced either to reduce the sulfur content of their fuel or to take other measures to comply with the TSP limit.

Admittedly, Connecticut's limits on direct particulate emissions do not control the secondary formation of particulates that occurs after sulfur dioxide leaves the smokestack and oxidizes in the atmosphere to produce sulfate particulates. The extent of such secondary formation is unclear, and the Agency has not yet approved any model that would enable it to predict accurately particulate concentrations resulting from $SO_2$ emissions.

■ Given the broad deference due the Agency's "choice of methods" in enforcing the Act, see *Connecticut Fund for the Environment v. EPA,* supra, 672 F.2d at 1006, we cannot say that the Agency's decision to review the 1.0% plan only for its effects on $SO_2$ was unreasonable. It seems clear that the plan at issue is primarily directed at regulating the amount of sulfur dioxide in the air, not at controlling concentrations of particulates. Although the combustion of fuel containing sulfur does result in the emission of only a very small percentage of the total particulates in Connecticut's air,[8]

6. The Agency asserts that almost all states are nonattainment for the secondary TSP standard, but petitioners dispute this assertion. We were informed after oral argument that Connecticut has attained the primary TSP standard. 47 Fed.Reg. 44,263 (1982).

7. As part of its effort to meet the requirement of reasonably available control technology (RACT) for TSP, see 42 U.S.C. § 7502(b), Connecticut has proposed an amendment to its Reg. 19–508–18(d) which would place more stringent limitations on the emission of particulate matter from fuel-burning sources. We are informed that the Agency approved this amendment in a final rulemaking that took

place after this case was argued. 47 Fed.Reg. 41,958 (1982).

The Fund argues that the 0.5% sulfur limit is a reasonably available control measure that must be implemented as soon as practicable under 42 U.S.C. § 7502(b)(2). We agree with the Agency, however, that it need not regard the sulfur limit as part of Connecticut's effort at imposing RACT on existing sources.

8. The exact percentage of particulates in the air attributable to stationary fuel burning sources is a matter of dispute among the parties. It is clear, however, that most of the particulates in Connecticut's air come from sources such as

such combustion accounts for more than 80% of all $SO_2$ in Connecticut's air. Moreover, control strategies for each pollutant may differ significantly. See generally 40 C.F.R. § 52 (1981). According to the Agency, limiting the sulfur content of fuel is an inefficient way to limit particulate concentrations because the relationship between the amount of sulfur in fuel and the amount of particulates emitted by fuel-burning sources is affected by many factors and cannot yet be quantified. Thus, most states apparently have different control strategies for TSP and $SO_2$.

This approach, developing separate plans for individual pollutants, seems authorized by the wording of the Act. The provisions of the Act regarding the Agency's evaluation of state implementation plans appear to allow separate control strategies to bring each pollutant within the applicable primary and secondary standards. 42 U.S.C. § 7410(a)(1) refers to "a plan" as providing for implementation of "such primary" or "such secondary standard." Similarly, 42 U.S.C. § 7410(a)(2)(A), (B), (H) refers to "a plan" as implementing "a standard." [9] Moreover, clean air areas under Part C of the Act and nonattainment areas under Part D are designated on a pollutant-specific basis. *Alabama Power v. Costle,* 636 F.2d 323, 350 (1979). Thus, the Agency's regulations specifically state that "Each nonattainment area and each plan, as defined in the Act, applies to only a single national ambient air quality standard." 44 Fed.Reg. 38,473 n. 15 (1979).

Accordingly, the Agency reviews SIPs for their adequacy in ensuring the attainment of the NAAQSs for a single pollutant. This

---

motor vehicle emissions, road dust and the salt added to Connecticut's roads in the winter.

**9.** The cited provisions read as follows:

(a)(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within nine months after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within nine months after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

(A) except as may be provided in subparagraph (I)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e) of this section) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D);

. . . .

(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977.

approach also has some inferential support in the case law. Cf. *Connecticut Fund for the Environment v. EPA,* supra, 672 F.2d at 1013 & n. 30 (allowing state to modify controls on carbon dioxide despite possible incidental increases in ozone concentrations); *Northern Ohio Lung Ass'n v. EPA,* 572 F.2d 1143, 1147–48 (6th Cir.1978) (upholding the Agency's approval of state plan to control particulates despite utility companies' argument that it was technologically infeasible for them to install devices limiting TSP emissions in the absence of final regulations stating how much sulfur dioxide they could legally emit).

The Fund's argument that allowing the Agency to focus on one pollutant at a time will frustrate the general purpose of the Act to protect and enhance the nation's air, 42 U.S.C. § 7401(b)(1), is not without force. But in light of the rationale for employing separate plans to control individual pollutants, the language of the Act and the relevant, though sparse, case law, we cannot say that the Agency's interpretation of the Act is unreasonable.

### V. Compliance with Part D of the Act

The Fund's second argument is related to its first, and fails for essentially the same reasons. The Fund notes that pursuant to Part D of the Act, states with nonattainment areas for any NAAQS are required to revise their SIPs to provide for attainment "as expeditiously as practicable." 42 U.S.C. § 7502. Although Connecticut has met the NAAQSs for $SO_2$, it has not attained the secondary standard for TSP. Moreover, the Connecticut Department has stated in narrative descriptions for its SIP that the 0.5% sulfur-in-fuel requirement "is also considered to be a particulate control strategy." Petitioners would therefore have us conclude that the relaxation of the sulfur-in-fuel requirement amounts to a sub silentio relaxation of a TSP nonattainment plan in violation of Part D of the Act.

■■■ The Agency strenuously urges that Part D of the Act leaves to the states a great deal of discretion as to specific emission limits so long as a state's plan as a whole provides for attainment of the national standards. According to the Agency, a state may legitimately choose to relax some emission limits and tighten others in its efforts to meet the national standards within the time constraints of the Act. We need not decide, however, whether Part D forbids relaxation of any emission limit within a nonattainment plan, because we agree with the Agency that the nonattainment provisions of Part D are not applicable. The SIP revision here deals with $SO_2$, and Connecticut is in attainment of the $SO_2$ standards. We see no reason why the Connecticut Department's narrative description of the 0.5% sulfur limit as a "particulate control strategy" should prevent the Agency from exercising its discretion to approve a revision it finds satisfactory for the control of $SO_2$.

Again, the Act seems to contemplate that nonattainment plans under Part D will operate on a pollutant-specific basis. The designation of an area as nonattainment occurs when the levels of a particular pollutant "exceed any national ambient air quality standard for *such* pollutant." 42 U.S.C. § 7501(2) (emphasis added). The Agency has interpreted the Act accordingly. 44 Fed.Reg. 38,473 n. 15 (1979). As already noted, the Fund disputes this interpretation. But as the District of Columbia Circuit has stated: "Where different interpretations of the statute are plausible, so long as EPA's construction of the statute is reasonable we may not substitute our own interpretation for the Agency's." *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1147 (citing *Train v. NRDC,* supra, 421 U.S. at 75, 95 S.Ct. at 1479), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).

Of course, Connecticut's TSP plan is subject to the nonattainment provisions of Part D of the Act. But the validity of that plan is not now before us. Connecticut has proposed revisions to that plan, and the Agency assured us in its brief that it was reviewing those revisions and that it would act on them "expeditiously."[10] We cannot say

---

**10.** The TSP plan has since been approved. See note 7 supra.

that the Agency's decision to consider the two plans separately was unreasonable, especially since petitioners are free to seek an appropriate remedy if Connecticut's TSP plan does not satisfy the requirements of the Act.

## VI.   Interstate TSP Pollution

Petitioners also contend that the Agency violated 42 U.S.C. § 7410(a)(2)(E) by failing to consider the impact of Connecticut's use of 1.0% sulfur fuel on the air of neighboring states.   Unlike the provisions of the Act that regulate Agency review of a SIP's intrastate impact on a particular pollutant, § 7410(a)(2)(E) does seem to suggest that a plan must be scrutinized for its interstate effects on all pollutants for which national ambient air quality standards are set, see note 2 supra.   Specifically, the Act requires the Administrator to withhold approval from a SIP that will "(I) prevent attainment or maintenance by any other state of *any* such primary or secondary ambient air quality standard, or (II) interfere with measures (of) . . . any other state . . . to prevent significant deterioration of air quality . . . ."   42 U.S.C. § 7410(a)(2)(E) (emphasis added).

■   The Agency does not agree that § 7410(a)(2)(E) requires it to scrutinize a SIP regarding one pollutant for its effect on all other pollutants.   We need not decide, however, whether the Agency's interpretation is so unreasonable as to constitute a "clear error in judgment."   See *Friends of the Earth v. USEPA,* supra, 499 F.2d at 1123 (citing *Citizens to Preserve Overton Park v. Volpe,* supra, 401 U.S. at 416, 91 S.Ct. at 823).   The Agency concedes that it did not consider the impact on neighboring states from the secondary formation of sulfate particulates that occurs after $SO_2$ is emitted into the atmosphere.   But the Agency claims it lacks a model that would enable it to predict accurately the effects of such secondary formation, and on this issue we must defer to the Agency's technical expertise.   While we are concerned about the possible interstate effects of the secondary formation of particulates, the question before us is whether under these circum-

stances the Agency was required to overturn Connecticut's proposed SIP revision regarding $SO_2$.   We think it would be unwise to order the Agency to consider effects it cannot accurately measure, cf. *Mision Industrial Inc. v. EPA,* 547 F.2d 123, 131 (1st Cir.1976), or to hold that its failure to do so was an abuse of discretion.

■   The Agency also failed to consider the interstate effects of primary TSP emissions, even though such emissions are apparently susceptible of measurement and were considered by the Agency in approving New York's SIP revision discussed in a companion case, *Connecticut Fund for the Environment v. EPA, Long Island Lighting Co.,* 696 F.2d 147 (*Connecticut Fund I*).   But again, Connecticut's Reg. § 19–508–18 (d), which limits the amount of particulates that may be emitted from industry smokestacks, remains in effect.   Accordingly, it does not appear that direct particulate emissions resulting from the proposed revision of Connecticut's SIP will have more than a minimal impact on TSP levels in nearby states.   The Agency's failure to measure these impacts, therefore, can hardly be deemed an abuse of discretion.   See *Connecticut Fund I;* cf. *Alabama Power Co. v. Costle,* supra, 636 F.2d at 360 (Clean Air Act permits exemptions for de minimis circumstances).

## VII.   Notice

Petitioners also argue that the Agency failed to provide adequate notice of the proposed revision of the sulfur control regulation, as required by 42 U.S.C. § 7410(a)(2), (a)(3)(A) and by 5 U.S.C. § 553(b), because the Agency did not indicate the proposed revision would affect the attainment of TSP standards.   Since we have concluded that the Agency did not abuse its discretion when it failed to consider the impact on TSP of Connecticut's $SO_2$ plan revision, the Agency's failure to advise the public of the plan's TSP impact was not improper.

## VIII.   Other Claims

The Fund's three remaining claims concern possible violations of the NAAQSs for

sulfur dioxide in Connecticut and in neighboring states. All three claims involve disputes over the Agency's methods of air pollution modeling, and must be resolved by the deference due the Agency's technical expertise in this field. Cf. *Sierra Club v. EPA,* 540 F.2d 1114, 1131 (D.C.Cir.1976).

■ First, petitioners claim that the relaxation of Connecticut's sulfur-in-fuel limit will impede the maintenance of the primary NAAQS for SO$_2$. Petitioners rely on analyses performed by the Connecticut Department, which predict that Connecticut's use of 1.0% sulfur fuel combined with the use of 2.8% sulfur fuel by Long Island Lighting Co. (LILCO) in Long Island, New York, see *Connecticut Fund I,* will cause such a violation.[11] But according to the Agency, the violation referred to by the Fund was predicted by a screening model that the Agency considers inaccurate. The Agency relies instead on other modeling analyses conducted by the Connecticut Department using Agency-approved models. The Agency asserts that it approved the new 1.0% sulfur limit only for those sources for which the approved modeling analysis demonstrated compliance with the SO$_2$ NAAQS. 46 Fed. Reg. 56,613 (1981). Under these circumstances, we must defer to the Agency's expertise.

■ Second, the Fund claims that the Agency violated 42 U.S.C. § 7410(a)(2)(E) because the new sulfur limit may hinder the efforts of neighboring states to fulfill PSD requirements with regard to SO$_2$. The Fund admits that early analyses showed no significant impact on "downwind" states, but notes that the final report of the modeling contractor showed a serious problem at one receptor point. The Agency claims that this report utilized unacceptable modeling assumptions, and argues that the earlier analyses were more reliable. Again, we must accept the Agency's technical analysis.

■ Finally, the intervenor City of Middletown claims that the Connecticut Department's modeling for the Hartford Electric Plant shows that its use of 1.0% sulfur fuel would cause a violation of the primary NAAQS for SO$_2$ in Middletown. Extrapolating from these results, the City contends that the use of 0.5% sulfur fuel is already causing violations in Middletown. As the Agency notes, however, the challenged regulation does not permit higher sulfur use at the Hartford plant. Accordingly, the proposed revision will have no effect on emissions from the Hartford plant. Moreover the Agency states that modeling analyses show that the use of 1.0% fuel by other sources in Connecticut will not contribute to possible violations in Middletown because the predicted impact of other sources near the Hartford plant is expected to be zero. Most important, the Agency states that the model relied on by the intervenor is a conservative model which should not be used to determine whether violations are actually likely to occur. Under the circumstances, we feel required to defer to the Agency's expertise and to reject the intervenor's arguments.

### Conclusion

The petition for review of the Agency's final rule approving Connecticut's use of 1.0% sulfur fuel is denied.

### APPENDIX

*Glossary*

| | |
|---|---|
| LILCO | Long Island Lighting Company |
| NAAQS | National Ambient Air Quality Standard |
| PSD | Prevention of Significant Deterioration |
| RACT | Reasonably Available Control Technology |
| SIP | State Implementation Plan |
| SO$_2$ | Sulfur Dioxide |
| TSP | Total Suspended Particulates |

---

11. According to the Fund, when the Agency completed its analysis of Connecticut's 1.0% plan, the Agency had not yet approved the use of high sulfur fuel by LILCO. As the Agency notes, however, LILCO has been burning high sulfur fuel for several years in Long Island, New York, 41 Fed.Reg. 29,817 (1976); consequently, Connecticut's recent modeling analyses do reflect LILCO's use of the high sulfur fuel.